C. K. GRAVIS, Jr., et ux., Appellants,

v.

PARKE–DAVIS & CO. et al., Appellees.
No. 788.

Court of Civil Appeals of Texas,
Corpus Christi.

Nov. 15, 1973.

Rehearing Denied Dec. 21, 1973.

**864**

Sidney P. Chandler, Corpus Christi, for appellants.

Kenneth Oden, Alice, Ronald B. Brin, Allison, Maddin, White & Brin, Corpus Christi, for appellees.

## OPINION

NYE, Chief Justice.

This is a products liability case. C. K. Gravis and his wife Elma Gravis, appellants, brought suit against Parke-Davis and Co., Winthrop Laboratories, Inc., and Sterling Drug Company, appellees, for personal injuries sustained by Mrs. Gravis. The case was tried before a jury. At the con-

clusion of plaintiffs' case in chief the appellees moved for an instructed verdict or in the alternative, to withdraw the case from the jury and render judgment as a matter of law. The motion was granted by the trial court.

Originally, Mrs. Gravis sued the hospital, the doctors, and the anesthetist for various acts of negligence which caused Mrs. Elma Gravis to be partially paralyzed and suffering from other injuries from an abdominal operation. In the former suit the plaintiffs also sued Abbott Laboratories with regard to drugs used in the operation. Summary judgment was entered for all defendants including Abbott Laboratories. Since there was no appeal by the plaintiffs as to Abbott Laboratories, that judgment became final. As to the other defendants the case was ultimately reversed and remanded for trial.[1]

Thereafter Mr. and Mrs. Gravis settled their suit with the doctors, the anesthetist and the hospital. Subsequently, they instituted this lawsuit against the drug firms whose products were used in the operation. The trial court again entered summary judgment for all defendants and the case was ultimately reversed and remanded for trial.[2]

On October 22, 1963 Mrs. Gravis complained of pain in her abdomen. Her husband telephoned Dr. Joseph, the family physician who agreed to and did meet them at the Physicians and Surgeons Hospital of Alice. The doctor's initial examination in the emergency room at the hospital and subsequent examinations and tests necessitated an exploratory operation. On October 24 Mrs. Gravis received the operation. It lasted one hour. Mrs. Ruth Grose administered a spinal anesthetic (containing three different drugs furnished by appellees) and pentothal sodium (furnished by

1. Gravis v. Physicians & Surgeons Hospital of Alice, 415 S.W.2d 674 (Tex.Civ.App.—San Antonio 1967) and Gravis v. Physicians & Surgeons Hospital of Alice, 427 S.W.2d 310 (Tex.Sup.1968).

2. Gravis v. Abbott Laboratories, Inc., 462 S.W.2d 410 (Tex.Civ.App.—Corpus Christi 1970) and Abbott Laboratories, Inc. v. Gravis, 470 S.W.2d 639 (Tex.Sup.1971).

Abbott Laboratories) to Mrs. Gravis which was given during the operation. An intestinal obstruction was found and corrected. Later, after she had been moved back to her own room Mrs. Gravis felt abnormal and couldn't move her legs. She was suffering from a number of physical disabilities including bladder trouble requiring a catheter continuously, phlebitis of the left leg, high blood pressure and other problems of the lower extremities.

The testimony showed that Dr. Joseph directed the anesthetist to use a spinal anesthetic composed of novocaine, dextrose, and adrenalin. The anesthetist followed a formula previously worked out by Dr. Joseph in preparing the anesthetic solution. The formula called for 2cc of novocaine and .5 cc of dextrose. These drugs were manufactured by Winthrop Laboratories and Sterling Drug Co. The other drug used was (1 cc) adrenalin which was manufactured by Parke-Davis and Co.

The evidence showed that epenephrine is produced by the adrenal gland in the body. Parke-Davis produces a synthetic epenephrine under the trade name of adrenalin. This drug is studied in medical schools and is one of the most commonly known drugs in the medical profession. It has a number of uses such as treating asthmatic conditions, controlling excessive bleeding, and is commonly used by dentists in a combination with local anesthetic because it tends to prolong the local anesthetic and constricts the vessels and therefore cuts down on bleeding. The adrenalin drug is a vaso constrictor. It acts to constrict the blood vessels. It is not an anesthetic agent nor does it have any anesthetic effect or quality. The dextrose is mixed with the other drugs so as to make the total solution heavier than the spinal fluid so that all of the drugs in solution can float along the spinal canal and anesthetize the specific area according to the location of the surgery. The adrenalin was used to prolong the anesthesia. Each drug had a different' purpose, but all of the drugs were compatible and such drugs had been used together

as an anesthetic for many years. Spinal anesthesia may be effectuated by novocaine alone and for operations under 45 minutes in duration, novocaine is often used alone.

The procedures for the administration of the spinal anesthetic were testified to by Mrs. Grose, the anesthetist. She' stated that she prepared the instruments needed for administering the anesthetic. The surgical instruments were autoclaved (heat treated) for sterilization. She described the procedure she followed on Mrs. Gravis as follows:

"You put the head, flex the head upon the chest and bring the knees up sharply as far as possible so that the back is rounded, and support the head with a pillow. Then the back is scrubbed with an antiseptic solution. Then you do a surgical scrub of your hands, put on gloves, assemble the needles and syringes and open the ampules, draw up the drugs that you want to use, agitate them, mix them or rotate them so that it's all one solution. Then you inject a small amount of novocain and ephedrine (sic) into the skin, into the skin so that the skin becomes numb, like the dentist does for your gums, and you put it a little deeper because you're going to use a longer needle for the spinal. When a minute or two has lapsed, that area is numb. Then you use the spinal needle which is a twenty gauge, three inch needle and put it in the proper interspace through the various layers of the back until you feel a slight snap or give, and then you are in the spinal column. When you take the stillette out of the needle, you will get the spinal fluid.

" 'In the syringe that you have the drugs ready to give, you attach that to the spinal needle and draw the spinal fluid to dilute your drugs further to make it all one solution and to be sure you're in the right space and everything is correct. Then you give your solution, take your needle out, wipe it off, turn the patient quickly on the

back, and raise the head up, and the spinal—the drugs float along and anesthetize the area that you want it.'"

Nurse Grose stated that she examined the drugs for defects. She testified that she had previously given 2500 spinals without any adverse effect; that if there was a defect in the ampule the contents would be "cloudy or granular or not look right". She stated that there was no cracks in the ampules and no discoloration of the drugs. She testified that these ampules came in a box of 100 and that she had used 75 out of the box without incident. The ampules were sterilized overnight before use. The anesthetist further testified that she continued to use the ampules thereafter and each was pure and did what it was supposed to do. She stated that the drugs used had given their desired results; that ampules from that box were used in two operations on that day; and that the remainder of the ampules were used without any reaction from any other patient.

Dr. Robert L. Fordtran, a diagnostician and a specialist in internal medicine, testified at great length. He had treated Mrs. Gravis following her stay at the Physicians and Surgeons Hospital in Alice. He was asked to see Mrs. Gravis in consultation with Dr. Klotz at Sphon Hospital in Corpus Christi, primarily to handle a phlebitis which Mrs. Gravis had developed in her leg. He had done a complete physical examination on her prior to trial. His initial diagnosis in 1969 was phlebothrombosis in the leg and peripheral neuropathy caused by the spinal anesthetic. He testified that there is a hazard in the administration of any kind of anesthetic that could in some cases cause death; that bad results do occur from use of bad anesthetics and occur sufficiently enough that manufacturers of anesthetics such as novocaine warn of that possibility in their literature. He testified as to such a package insert, (disclosure) on the part of Winthrop Laboratories with respect to novocaine. He concluded by testifying that it was his opinion that Mrs. Gravis' condition was related somehow to the spinal anesthetic. He was questioned:

"Q. Okay. And when you say that, you mean to say that like one of those cases that just happens once in every 200,000 times, this just happened, is that what you mean?

A. Yes, sir. Because like I say, this is something people have knowledge of, but it's extremely rare and I personally have never seen before.

Q. And indicates no wrongdoing on anybody's part?

A. It doesn't indicate any wrongdoing on anybody's part as far as I can tell.

Q. Or any defect in any of the procedures or the *medication*?

A. According to the information I have." (emphasis supplied)

Dr. Fordtran testified that Mrs. Gravis' condition is described on the Winthrop Laboratories exhibit 1 (the disclosure warning) and "that's essentially what we have here. . . ." The Winthrop brochure lists a number of permanent complications associated with spinal anesthetic. The one that Dr. Fordtran was testifying about described the complications and side effects as follows:

"In isolated instances one or several of the following complications or side effects may be observed during or after spinal anesthesia.

\*    \*    \*    \*    \*    \*

*Cauda equina and lumbosacral cord complications* (usually consisting of arachnoiditis and demelinization) *result in loss or impairment of motor and sensory function of the saddle area (bladder, rectum) and one or both legs. These complications have occurred after the use of most, if not all, spinal anesthetics. The loss or impairment of motor function may be permanent, or partial recovery may slowly occur.* Various explanations

for such complications have been advanced, such as hypersensitivity or intolerance to the anesthetic agent with a resultant myelolytic or neurotoxic effect; pooling or relatively high concentrations of anesthetic solution around the cauda equina and spinal cord before diffusion; and accidental injection of irritating antiseptics or detergents (as when syringes are incompletely cleansed or when the ampule storage solution enters a cracked ampule). Hence, many anesthesiologists prefer to autoclave ampules in order to destroy bacteria on the exterior before opening.

In an article on the hazards of lumbar puncture. Dripps and Vandam (J.A.M. A. 147:1118, Nov. 17, 1951) pointed out that prolonged and occasionally permanent sensory or motor abnormalities may result from direct trauma to nerve roots when the puncture is performed. In some of the reported cases of neurologic sequelae it was found that the disturbance was due to preexisting disease of the vertebral column or central nervous system (for example, cord tumors, malignant metastases, multiple sclerosis)." (Emphasis supplied)

These warnings are directed to the attending physician because as the brochure points out,

## "CONTRAINDICATIONS AND PRECAUTIONS

With the exception of infection in or about the lumbar area and certain serious diseases of the central nervous system or of the lumbar vertebral column, most anesthesiologists consider the following conditions to be only relative contraindications. The decision whether or not to use spinal anesthesia in an individual case depends on the physician's appraisal of the advantages as opposed to the risk and on his ability to cope with the complications that may arise."

Dr. Fordtran testified that a result such as the one involved in this case is extremely rare (" . . . once in 200,000 times . . .") but it is known to happen after spinal anesthetic. He testified that the adrenalin drug had nothing to do with Mrs. Gravis' condition.

■ The appellants in their first four points of error contend that the trial court erred in granting the instructed verdict because there was sufficient evidence presented to raise disputed fact issues that should have been submitted to a jury. This case differs from all of the prior cases (see footnotes 1 and 2) on appeal where summary judgments were granted. There the movant had the burden of proving that there was no disputed issue of material fact. Gibbs v. General Motors, 450 S.W.2d 827 (Tex.Sup.1970); Great American Reserve Co. v. San Antonio Plumbing Company, 391 S.W.2d 41 (Tex.Sup.1965). See Torres v. Western Fire and Casualty Co., 457 S.W.2d 50 (Tex.Sup.1970). The distinction between summary judgment and directed verdict was recognized by the Supreme Court in Glenn v. Prestegord, 456 S.W.2d 901 (Tex.Sup.1970). The appellate court must look to the evidence offered by the plaintiff to determine if a genuine issue of fact exists which would require a jury verdict. The difference between the summary judgment case and the instructed verdict is fundamental and drastic. The plaintiffs now have the burden of proof. Glenn v. Prestegord, supra. In passing upon the propriety of the trial court's action, however, it is the duty of this Court to view the evidence as a whole and all reasonable inferences and deductions that may be properly drawn therefrom in the light most favorable in the contention of the appellant. Anglin v. Cisco Mortg. Loan Co., 135 Tex. 188, 141 S.W.2d 935 (1940); Constant v. Howe, 436 S.W.2d 115 (Tex. Sup.1968).

The appellants have the burden of proving the essential elements of their cause of action as set out in Section 402a of the Re-

statement of the Law of Torts (2d Ed.). It reads as follows:

## "TOPIC 5. STRICT LIABILITY

§ 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applied although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

■ Texas has followed this Restatement in a number of cases involving products intended for human consumption. Decker & Son v. Capps, 139 Tex. 609, 164 S.W.2d 828 (1942); McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.Sup. 1967). The plaintiff is faced with an arduous burden of proof. He must prove that: 1) the product in question was defective; 2) the defect existed at the time the products left the hands of the defendant; 3) that because of the defect the product was unreasonably dangerous to the user or consumer (plaintiff); 4) that the consumer was injured or suffered damages; 5) and that the defect (if proved) was the proximate cause of the injuries suffered. Abbott Laboratories v. Gravis, 470 S.W.2d 639 (Tex.Sup.1971). See 21 S.W. Law Journal 629, 640 (1967) by Gerald W. Ostarch. As Dean Keeton states: "The plaintiff is no longer required to impugn the maker but he is required to impugn the product. Simply stated the product must be defective as marketed. . . ." Keeton, Products Liability and the Meaning of Defect, 5 St. Mary's Law Journal 30, 33 (1973). Proof (either direct or circumstantial) that a drug in the anesthetic was defective is the prime requirement for recovery in this case. Pittsburg Coca Cola Co. v. Ponder, 443 S.W.2d 546 (Tex.Sup.1969); Technical Chemical Company v. Jacobs, 480 S.W.2d 602 (Tex. Sup.1972).

■ The crux of this case, then, is proof of the existence of a defect in the drugs furnished by the appellees. There is no evidence that the drugs were impure or defective. All of the evidence indicates the contrary. The drugs were clear when visually inspected. Ninety-nine out of 100 that were in the original carton did not cause any injury. All sterilization processes were observed. There was no evidence that the drugs were administered improperly. Testimony showed that ampules from the same carton before and after the one used on Mrs. Gravis were administered without ill effects. The plaintiffs, on the other hand, did not rule out all of the other possible causes of the injury which could establish circumstantially at least, that the defective drug was the only cause. Although Dr. Fordtran testified that in his opinion the injury of Mrs. Gravis was related (somehow) to the spinal anesthetic, he does not testify that the drugs were defective and hence the cause. Evidence on the critical issue of the existence of a defect in the drugs was not established. Dr. Fordtran admitted that the same results could occur from a hypersensitive reaction (abreaction) where there was no defect in the drugs administered. See (definition) Alberto-Culver Company v. Morgan, 444 S.W.2d 770, 776 (Tex.Civ.App.—Beaumont 1969), writ ref'd n. r. e. The fact that the

plaintiff was injured does not create liability.

The appellants have a misconception of the law of strict liability. In their brief they contend:

"That anesthetic was composed of drugs manufactured by three parties who are the Appellees. Under this record all of the drugs came from the laboratories of the Appellees in sealed packages and in sealed ampules within that sealed package. It is not the Appellants duty to point to any one Appellee as the party responsible for the injury. The inference, under strict liability, is that since the drugs were in sealed containers and caused serious injury to Elma Gravis one or more of the drugs was unfit for use as a part of the spinal anesthetic when that one or more drugs left the laboratory of the manufacturer. It is the duty of the Appellees to prove which drug or drugs did the damage. We must remember that under the Rule of Strict Liability the manufacturer is liable even if without fault. That is the public policy in Texas, as well as in practically all the states."

▇ The fact that the product was delivered in a sealed container aids the plaintiffs' case insofar as it gives rise to the inference that the product reached the consumer without substantial change, not that the product was defective. McKisson v. Affiliates Sales, Inc., 416 S.W.2d 787, 792 (Tex.Sup.1967).

The appellants' theory of a compensable injury is also without merit. They state in their brief that:

"There are two probable causes for the injury and either one is sufficient, though we do not have to point out the defect under the law, we say that under the evidence the ampule that contained novacaine had, in all probability, too much novacaine therein. It probably had over 200 mgs. of novocaine, which made it unfit for the use for anesthesia.

The other probability is, the adrenalin was stronger than 1:1000 in saturation. It constricted the blood vessels in the spinal column to the extent that it probably cut off the blood supply to the nerves to excess and for too long, thereby destroying those nerves."

The evidence shows that the drug adrenalin is not an anesthetic agent. Even when blended or mixed with other agents in the anesthetic solution adrenalin did not change properties or character. There is no evidence that adrenalin caused any injury or was defective in any way. There was no evidence that too much novocaine or adrenalin was administered. Appellants' points one through four are overruled.

Appellant in his 16th point contends that he was entitled to a jury issue based on the failure of the drug company to warn of a possible injury even if the anesthetic was not defective. Dean Keeton in an excellent article states that a product can be defective as marketed in several different ways, one of which is: " . . . (3) purchasers and those who are likely to use the product may have been misinformed or inadequately informed either about the risks or the danger involved or how to avoid or immunize the harmful consequences from such risks." Keeton, Products Liability and the Meaning of Defect, 5 St. Mary's Law Journal 30, 34 (1973). See also Noel, Products Defective Because of Inadequate Directions or Warnings, 23 S.W. Law Journal 257 (1969). Restatement of Torts (2d Ed.) Sec. 402a, Comments J and K (1965).

▇ If a product is unreasonably or inherently dangerous, a warning is required. Restatement of Torts (2d Ed.) Sec. 402a, Sec. 388 (1965). When the defect is due to inadequate labelling, the defect and the products are separable. The plaintiff is still confronted with the burden of proof. The Supreme Court recently stated "In the words of Dean Keeton, when a product is defective due to inadequate labeling 'the aspect of the defendant's conduct that

made the sale of the product unreasonably dangerous (i. e. the label) must be found to have contributed to the plaintiff's injury.' 48 Tex.L.Rev. at 413. This means that it is incumbent upon the plaintiff to secure a jury finding that the faulty label was the cause of the injury." Technical Chemical Company v. Jacobs, 480 S.W.2d 602 (Tex.Sup.1972). There was no such proof in this case at bar.

■ There is testimony concerning the dangerous propensities of novocaine. These dangers are common knowledge in the medical profession. Another question before us is whether the manufacturer was required to warn Mrs. Gravis of the dangers in the drugs. The brochure accompanying the ampules of novocaine gave the medical personnel involved detailed instructions and warnings concerning the handling and administration of the drug. The warnings were directed to the attending physician. We believe that it was unreasonable to suppose that a drug manufacturer must go beyond the physician and give actual warnings to the patient. Once the physician has been warned, the choice of which drugs to use, and the duty to explain the risks involved, is his. These drugs were manufactured for administration only by a physician or other authorized person. Generally speaking, only a physician would understand the propensities and dangers involved. The doctor is a learned intermediary between the manufacturer and the ultimate consumer. If the doctor has been properly warned of the possible side effects, then we believe it is his duty to convey this warning on to the patient compatible with such a reasonable disclosure as the law imposes. See Karp v. Cooley, 349 F.Supp. 827 (S.D.Tex.1972) and authorities cited therein. In the Cooley case it was suggested that some disclosures may so disturb the patient that they serve as a hindrance to needed treatment. See also Hall v. United States, 136 F.Supp. 187 (W.D.La.1955).

■ In this case, the physician, the anesthetist, and the hospital have settled with the plaintiff in another lawsuit. The question is moot as to whether the specific doctor or others breached their duty to warn Mrs. Gravis. We hold that it is unreasonable to demand that the manufacturer of drugs specifically warn each and every patient that receives drugs prescribed by the physician or other authorized persons. The entire system of drug distribution in America is set up so as to place the responsibility of distribution and use upon professional people. The laws and regulations prevent prescription type drugs from being purchased by individuals without the advice, guidance and consent of licensed physicians and pharmacists. These professionals are in the best position to evaluate the warnings put out by the drug industry. Our holding in no way relieves the drug company in their duty to warn or to provide a product free of defects.

■ Concerning the remaining two drugs, adrenalin and dextrose, apparently there were no written warnings furnished. However, there was no evidence that the lack of an insert warning or label caused appellants' injury. The test is outlined in Technical Chemical Company v. Jacobs, 480 S.W.2d 602 (Tex.Sup.1972). In the case before us there was no evidence that either adrenalin or dextrose were of themselves dangerous or in any way caused Mrs. Gravis' injuries. In fact, evidence showed that the opposite was true. Appellants' point is overruled.

■ In three points of error (points 5, 6, and 7) appellants argue that it was error for the trial court to have ordered that the appellees need not answer his second request for admissions. The information appellant wanted appellees to admit were obviously material borrowed from some type of medical publication. Appellants wanted the appellees to admit certain definitions and statements concerning the drugs in question. The Supreme Court has held

that excerpts from medical authorities may be read into evidence, not as original evidence, but to discredit testimony or to test its weight. We hold that the trial court did not err in sustaining the objections to appellants' request for admissions. Rule 169, Texas Rules of Civil Procedure may not be used to accomplish the introduction of inadmissible evidence. Boyles v. Bourdan, 148 Tex. 1, 219 S.W.2d 779 (1949).

In another point of error (point 8) the appellants complain of the action of the trial court in granting appellee's motion in limine. Appellants argue that the motion in limine absolutely excluded the matters they brought up in trial. The order by the trial court stated that the appellants must get a court ruling before discussing those matters, set out in the motion, before the jury or a jury panel. The law is, that a motion in limine is designed to exclude the questions and statements with respect to irrelevant matters. For an objection on appeal to be proper, the statements and questions must be asked. The appellant did not bring the evidence forward at the trial. Accordingly he cannot now complain of the error. Bridges v. City of Richardson, 354 S.W.2d 366 (Tex.Sup.1962); Hartford Accident and Indemnity Co. v. McCardell, 369 S.W.2d 331 (Tex.Sup.1963); Gulf States Abrasive Manufacturing, Inc. v. Oertle, 489 S.W.2d 184 (Tex.Civ.App.—Houston 1st Dist. 1972 wr. ref. n. r. e.); Lopez v. Allee, 493 S.W.2d 330 (Tex.Civ.App.—San Antonio 1973); City of Corpus Christi v. Nemec, 404 S.W.2d 834 (Tex.Civ.App.—Corpus Christi 1966).

All of the other points of error have been examined and are without merit. The excluded evidence attributes the injury to the anesthetic but sheds no light on the defect of the drugs themselves. Therefore if there was error to exclude the proffered items, it was harmless error. Rule 434, T.R.C.P. Three points of error asserted by the appellant were addressed as "fundamental". These points do not fall within

the narrow construction which we may give to determine if fundamental error is present. McCauley v. Underwriters Ins. Co., 157 Tex. 475, 304 S.W.2d 265 (1957).

Judgment of the trial court is affirmed.