**Harold N. COOPER, M. D., Appellant,**

v.

**A. E. BOWSER et al, Appellees.**

**No. 1343.**

Court of Civil Appeals of Texas, Tyler.

Dec. 18, 1980.

Charles E. Sweetman and Allison & Plumb, Peter N. Plumb, San Antonio, for appellant.

Lawrence J. Madigan, Richard L. Josephson, Houston, George Spencer, Joseph L. Segrato, San Antonio, for appellees.

SUMMERS, Chief Justice.

This is a medical malpractice and products liability case. A. E. Bowser and his wife, Margarita Bowser, brought this action against Harold N. Cooper, M.D. (appellant), Leonard Cowan, Ciba-Geigy Corporation (Ciba-Geigy) and Merck and Co., Inc. (Merck) to recover damages for injuries sustained by Mr. Bowser. The Bowsers alleged that A. E. Bowser's injuries were caused by the negligence of Dr. Cooper and his employee, Leonard Cowan, in using the drugs Sterazolidin (a Ciba-Geigy product) and Indocin (a Merck product) to treat an injury to Mr. Bowser's right knee. The Bowsers further alleged that the failure of the drug manufacturers, Ciba-Geigy and Merck, to provide adequate instructions regarding the use of the drugs was a producing cause of Mr. Bowser's injuries.

Defendants Cooper, Ciba-Geigy and Merck filed cross-actions against each other for indemnity and contribution. The West American Insurance Company (American) intervened to recover worker's compensation benefits paid to Mr. Bowser.

The case was tried to a jury, and at the close of the evidence the trial court granted motions for instructed verdicts for Ciba-Geigy and Merck. Based on the jury's verdict, a judgment was rendered that the Bowsers and American recover damages in the amount of $240,735.30 against Dr. Cooper; that the Bowsers and American take nothing as to the other defendants and that each defendant take nothing by reason of their respective cross-actions. From this adverse judgment appellant Dr. Cooper has prosecuted this appeal against the Bowsers, American and Ciba-Geigy. The defendants Cowan and Merck are not parties to this appeal.

We affirm.

On April 9, 1975, A. E. Bowser was hitting a car bumper with a hammer when the hammer slipped and hit his right knee. Bowser was working on a job at the time for Dale's Paint and Body Shop where he had been working for a number of years.

Mr. Bowser had been engaged in automobile body repair work for approximately nineteen years and at the time the hammer hit his knee was 45 years old, a married man with four children.

He continued to work on April 9, the day he hit his knee, and on the following day, April 10, his employer sent him to the company doctor, Dr. Harold Cooper, for treatment of the knee injury.

Mr. Bowser was given an x-ray and a physical examination of his right knee which revealed that he had a bruised knee with swelling and fluid in the joint. Upon completion of this examination, Dr. Cooper prescribed thirty capsules of the drug Sterazolidin with the direction that one capsule be taken three times a day, or enough for ten days. Mr. Bowser was then released to return to light duty work and given an appointment for a follow-up examination on April 18, 1975.

Mr. Bowser returned to Dr. Cooper's office on April 11, 12, 14, and 15, 1975. Dr. Cooper did not see him on these occasions, but his medical assistants saw him and as-

sisted with therapy to the knee. After starting the medication on April 10 and during the period of time he was returning to Dr. Cooper's office, Mr. Bowser began to experience headaches, dizziness, muscle pain over his body, pressure and ringing in his head and ears and had difficulty in controlling his body motion. On April 18, 1975, Dr. Cooper examined Mr. Bowser. He noted that the swelling in the knee was reduced but that it was still painful and inflamed. He prescribed forty capsules of Indocin to alleviate the pain and inflammation and released Mr. Bowser to return to regular work duty on April 21st. Over the period of nine days from April 10 through April 18 Dr. Cooper prescribed six different prescription drugs for treatment of Mr. Bowser's bruised knee. Two of these prescription drugs, Sterazolidin, manufactured by Ciba-Geigy, and Indocin, manufactured by Merck, are potent drugs and are capable of causing injury to the central nervous system, loss of hearing and loss of eyesight.

On April 21, 1975, Mr. Bowser saw his regular family physician, Dr. Pedro De-Leon, who noted that Mr. Bowser was on Sterazolidin and Indocin, and placed Mr. Bowser in the hospital on the following day, April 22nd. Dr. DeLeon requested consultation from Drs. Neigut, Gordon, Huey and Wilson. Mr. Bowser was discharged from the hospital in a wheelchair some two months later on June 26, 1975, suffering from loss of hearing, loss of eyesight and loss of motor control.

The main thrust of Mr. Bowser's case was that Dr. Cooper was negligent in using the drugs Sterazolidin and Indocin and that the toxic effects of the drugs caused his injuries. Eight physicians testified at the trial of this cause, Dr. Cooper and six physicians called by him, and plaintiff's medical expert, Dr. Arthur Grollman. Dr. Cooper endeavored to show that Mr. Bowser's condition was one of long standing duration unrelated to the drugs he used in the treatment of Mr. Bowser's bruised knee. Of the six physicians called to testify by Dr. Cooper, only three of these physicians, namely Drs. Gordon, Huey and Rolfini, were involved in Mr. Bowser's medical picture since

his knee injury and the use of the drugs in question. Dr. Gordon, an internist, and Dr. Huey, a neurologist, both of whom were consultants during Mr. Bowser's April 1975 hospitalization, admitted they were puzzled by Mr. Bowser's condition. Both considered the possibility of a drug reaction as the cause of his condition, and admitted they did not know what his condition was or the cause of that condition; but it was their opinion he was suffering from a systemic collagens disease in spite of the fact that all specific tests for collagens disease were negative for same.

Dr. Rolfini, a physical rehabilitation physician, testified that Mr. Bowser had the remnants of old polio in one leg but that his present problems, he felt, were mental and emotional rather than physical; however, Dr. Rolfini agreed with the neurologist, Dr. Huey, that Mr. Bowser was unable to work. The three remaining physicians who were called to testify by Dr. Cooper did not give an opinion as to Mr. Bowser's condition after Dr. Cooper's use of the drugs in the treatment of Mr. Bowser's knee bruise. Dr. Trick testified as to the propriety of Dr. Cooper's use of the drug Sterazolidin in treatment of a bruised knee but did not give an opinion as to Mr. Bowser's condition or the cause of that condition. The remaining physicians, Dr. Lee, an ophthalmologist, and Dr. Palmer, an ear, nose and throat specialist, testified with respect to medical problems experienced by Mr. Bowser many years prior to his April 1975 injury, Dr. Lee as to treatment of an industrial injury when Mr. Bowser had some foreign body or acid in his eye and Dr. Palmer as to an ear infection that was alleviated with an antibiotic.

Plaintiff Bowser's expert witness was Dr. Arthur Grollman. Dr. Grollman had extensive qualifications and personal knowledge of the use of prescription drugs in patient therapy and the dangerous propensities and consequences that may result in the use of such drugs. He was a member of the Commission on Drug Safety and a teacher in medical schools for fifty-four years. He was a professor of medicine at the Universi-

ty of Texas Medical School at Dallas from 1950 through 1977 (serving as head of the Department of Pharmacology and Therapeutics for many years) and was teaching at the University of Alabama at the time of his video tape deposition herein. He had authored seven editions of the medical textbook *Pharmacology and Therapeutics* which deals with the nature of drugs, what they are, what they do, when and how to use them and their toxic effects. In fact, Dr. Grollman had taught the appellant, Dr. Cooper, in medical school, and Dr. Cooper admitted both Dr. Grollman and Dr. Grollman's book *Pharmacology and Therapeutics* were authoritative in the study of drugs in patient therapy. This text dealt with the drugs in question in this case.

Dr. Grollman testified on the basis of a hypothetical question containing facts proven in evidence. Dr. Grollman's opinion was that Bowser's condition was one of central nervous system injury caused by the drugs, Sterozolidin and Indocin.

Dr. Cooper predicates his appeal upon two points of error. In his first point of error, appellant Cooper complains that the trial court erred in admitting the opinion testimony of the plaintiffs' expert witness, Dr. Arthur Grollman, regarding the cause of Mr. Bowser's injuries because his opinions were based substantially on a hearsay consultation report contained in the hospital records.

By Appendix "A" to his brief, appellant Dr. Cooper attaches a document purporting to be the consultation report of Dr. J. Neigut referred to in his first point of error. This document is not included in the appellate record either by way of bill of exception in the transcript, the statement of facts or the exhibits admitted into evidence by the trial court. Because this document is not a part of the appellate record, the motion of appellees Bowsers and American Insurance to strike Appendix "A" to Dr. Cooper's brief and to assess the merits of his first point of error within the confines of the appellate record is granted.

The burden is on the appellant to present a record sufficiently complete to show clearly the action of the court and the error of which he complains. If he brings up a record that shows only a portion of the proceedings, every reasonable presumption will be indulged in favor of the ruling below, and a reversal will not be ordered unless it appears that on no possible state of the case could the ruling be upheld. 6 TEX.JUR.3d *Appellate Review* § 750, pages 21–23 and authorities there cited; *Torrey v. Cameron*, 74 Tex. 187, 11 S.W. 1088, 1089 (1889).

Dr. Grollman's testimony was introduced by means of a video tape deposition which has been transcribed and is before this court in the statement of facts. As shown by the record Dr. Grollman was asked to assume certain hypothetical facts that would be proven in evidence regarding Mr. Bowser's condition and Dr. Cooper's treatment of that condition. He was told that based upon these assumed facts, he would be asked certain questions calling for his opinion; that his answers should be based on reasonable medical probability and only on that basis; that when asked questions involving medical practices or medical treatment or medical care that prevail in San Antonio, his answers should be based upon the minimum safe and accepted medical practices prevailing in San Antonio in April 1975.

Appellant Dr. Cooper joined in an objection made by Mr. Spencer for defendant Merck to the answers given to the last two questions in the following testimony of Dr. Grollman:

Q: Let us turn to Mr. Bowser's condition *as I have outlined to you in hypothetical facts.* (Emphasis supplied.) Do you have an opinion as to his condition?

A: I do.

Q: What is that?

A: That it was as stated in the records, which are very excellent records and described it, that he had a minor, relatively minor, contusion, bruise, having been hit on his knee.

Q: Alright, but do you have an opinion as to his condition after the use of these drugs?

A: Yes.

Q: What is that opinion?

A: Well, that he had suffered—he was a different person. He could no longer walk. He apparently—well, he had trouble with his ears. He was blind in one eye. He had both eyes affected. His vision had changed. And all this had occurred since he began taking the drugs.

Q: Did he sustain an injury—well, do you have an opinion as to whether or not he sustained an injury from the use of the drugs Sterazolidin and Indocin?

A: I do.

Q: What is that opinion?

A: That these changes which he now manifested were the result of the drugs, taking the drugs.

The objection made to the foregoing was as follows:

Mr. Spencer: Defendant, Merck & Company, Inc. objects to the answers of Dr. Grohman [sic] set out on Page 54, line 7 and Page 54, lines 9 and 10 of his transcribed deposition because the overall deposition demonstrates he is basing his opinion on the hospital records, which include a speculative diagnosis by Dr. Neigut over a condition which is shown by the record themselves and the evidence thus far in the case to be a diagnosis over which doctors would differ, that is to say, whether the drugs caused his condition and, therefore, this doctor's opinions based on these records and particularly, Dr. Neigut's diagnosis of a possible drug reaction is not admissible.

The trial court overruled this objection and the same objection made by Mr. Spencer for Merck joined in by Dr. Taylor to the following testimony:

Q: All right, Doctor. Are you telling us that he was injured as a result of using these two drugs?

A: I am.

Dr. Cooper now contends in his first point of error that the trial court erred in admitting the opinion testimony of Dr. Grollman regarding the cause of Mr. Bowser's injuries because his opinions "... were based substantially on a hearsay consultation report contained in the hospital records." Dr. Cooper assumes as true the basic fact upon which his point of error must stand or fall, i. e., that the opinion of Dr. Grollman was in fact substantially based on a consultation report contained in the hospital records.

Dr. Grollman never stated or intimated that his opinions were based *substantially on a consultation report* contained in the hospital records. The record reflects that Dr. Grollman's opinion was based on extensive qualifications in the area of drugs, personal knowledge of the use of prescription drugs in patient therapy, and on a lengthy hypothetical question embracing facts proven in evidence by testimony from witnesses and facts from the hospital records in question which were also proven. Dr. Cooper had the burden under his point of error of showing that Dr. Grollman's opinion was in fact substantially based upon a hearsay consultation report contained in the hospital records. The record reflects that at three times during the course of his direct examination, Dr. Grollman was asked to base his opinions on the hypothetical question given him and the facts assumed in such question. Accordingly, it was incumbent upon Dr. Cooper to ask Dr. Grollman if in fact he based his opinions on a consultation report contained in the hospital records and not on the hypothetical question. However, Dr. Cooper elected not to ask such question and now urges the court to disregard the hypothetical question asked Dr. Grollman, disregard the facts proven in evidence embraced within the hypothetical question, and find that Dr. Grollman based his opinion *substantially on a consultation report* contained in the hospital records. The trial court clearly emphasized the point of Dr. Cooper's failure to ask Dr. Grollman if his opinions were based substantially on a consultation report contained in hospital records when he stated:

"I will overrule the objection ... on the theory that a person with the qualifications of the witness would not be likely to base his own opinions on the opinion of others about the precise condition that is being inquired about; and secondly, that if that was the case, it was something to be developed under cross-examination of the witness, so I will overrule the objection."

Dr. Cooper's brief misconstrues Dr. Grollman's comments regarding Dr. Neigut's impression of Mr. Bowser's condition. Dr. Grollman's commendation to Dr. Neigut for his perceptive diagnosis should not be distorted and transformed into a dependence on that diagnosis in forming his own opinion. Dr. Grollman was merely commending Dr. Neigut for having reached the proper diagnosis.

Furthermore, there is another aspect of Dr. Cooper's failure to sustain his burden of proving the basic premise on which his first point of error is based. This was the failure of Dr. Cooper to present the trial court with the consultation report in question and Dr. Cooper's failure to properly bring forward such consultation report in the appellate record.

■ It is within the province of counsel to assume, within the limits of the evidence, a state of facts which he contends the evidence justifies and which enables the witness to form an intelligent answer from the facts assumed. *Pan American Fire & Casualty Company v. Reed*, 436 S.W.2d 561, 564 (Tex.Civ.App.-Amarillo 1968, writ ref'd n. r. e.). Hypothetical questions should, however, be restricted to the facts in evidence or to be put in evidence in order to prevent misleading or confusing the jury. *J. Weingarten, Inc. v. Tripplet*, 530 S.W.2d 653, 655 (Tex.Civ.App.-Beaumont 1975, writ ref'd n. r. e.).

■ In the instant case Dr. Grollman was given a hypothetical question embracing facts in evidence, including portions of the hospital records, and asked to base his opinions on such hypothetical question. The consultation report about which Dr. Cooper complains was neither admitted into evidence nor included in the hypothetical propounded to Dr. Grollman. In view of the hypothetical question, the unchallenged facts embraced within same, and the clear personal knowledge of Dr. Grollman regarding the subject matter of his opinions, the trial judge properly admitted the opinions into evidence and the basis of Dr. Grollman's opinions fall within and satisfy the parameters of acceptable legal bases for expert opinions established by the Supreme Court in *Moore v. Grantham*, 599 S.W.2d 287 (Tex.1980). Appellant's first point of error is overruled.

■ Appellee Bowser had contended in his pleadings that defendants Ciba-Geigy and Merck had failed to provide an adequate warning concerning the dangers of their drugs Sterazolidin (Ciba-Geigy) and Indocin (Merck) and that this failure was a producing cause of the injuries to Mr. Bowser. In his cross-actions against Ciba-Geigy and Merck, Dr. Cooper prayed for indemnity or alternatively, contribution, in the event of a judgment against him. At the close of all the evidence, defendants Merck and Ciba-Geigy each moved for an instructed verdict contending that there had been no evidence that the warning given by defendants Ciba-Geigy and Merck respectively with regard to their product was inadequate and furthermore, there was no evidence that even if such warning was inadequate that it was a producing cause of Mr. Bowser's injuries. Both motions were granted by the trial court as to the primary claim of the Bowsers and the cross-action of Dr. Cooper against each of said defendants. Dr. Cooper's second point of error complains of the trial court's action only with respect to Ciba-Geigy. This point contends that the trial court erred in granting an instructed verdict for Ciba-Geigy because there was sufficient evidence that they failed to provide adequate instructions, warnings and precautions regarding the use of the drug Sterazolidin and that such failure was a producing cause of Mr. Bowser's injuries.

The duty of a manufacturer of pharmaceutical products was set out in *Gravis v.*

*Parke-Davis & Co.*, 502 S.W.2d 863 (Tex. Civ.App.-Corpus Christi 1973, writ ref'd n. r. e.). In *Gravis*, the Court of Civil Appeals set down the principle that a drug manufacturer must warn the physician of the dangers of its product, and once the physician is warned, the choice of which drugs to use and the duty to explain the risks become that of the physician. The principle derived from *Gravis* has been followed in subsequent decisions. *Crocker v. Winthrop Laboratories*, 514 S.W.2d 429 (Tex.1974); *Bristol-Myers Co. v. Gonzales*, 548 S.W.2d 416, 425 (Tex.Civ.App.-Corpus Christi 1977, *rev'd other grounds*, 561 S.W.2d 801 (Tex.1978)).

The Texas Supreme Court in *Technical Chemical Co. v. Jacobs*, 480 S.W.2d 602 (Tex.1972) clearly enunciated the principle that in a case involving a failure to warn not only was proof of a defective warning necessary, but to recover, it was also incumbent upon the plaintiff to adduce proof that the failure to warn was a producing cause of the plaintiff's condition or injury. Applying the principles in *Gravis* and *Jacobs*, for the position to be sustained that the trial court erred in granting Ciba-Geigy's motion for instructed verdict, there must have been evidence presented at the trial that the warning of Ciba-Geigy concerning the drug Sterazolidin was inadequate *and* that the failure of Ciba-Geigy to give an adequate warning was a producing cause of the plaintiff's condition or injury.

The Texas courts have long held that an instructed verdict is proper only when the record reflects no evidence of probative force in favor of the losing party. *White v. White*, 141 Tex. 328, 172 S.W.2d 295, 296 (1943); *Spiller v. Spiller*, 535 S.W.2d 683, 684 (Tex.Civ.App.-Tyler 1976, writ dism'd). In determining whether a verdict was properly instructed, the appellate court must view the evidence and the reasonable inferences therefrom in the light most favorable to the losing party. *White v. White* and *Spiller v. Spiller, supra.*

The only evidence introduced at trial which dealt specifically with the question of the adequacy of Ciba-Geigy's warnings regarding the use of Sterazolidin consisted of the manufacturer's information contained in the 1975 Physicians' Desk Reference (PDR) and the testimony of Dr. Grollman called by appellee Bowser and the appellant himself, Dr. Cooper. None of the other six physicians who testified in this cause were examined with respect to this subject.

Ciba-Geigy makes an "important note" at the inception of its information in the Physician's Desk Reference regarding the use of Sterazolidin which contains the following:

> ... the active ingredients of Sterazolidin are both potent drugs; .... and cannot be considered a simple analgesic and should never be administered casually. Each patient should be carefully evaluated before treatment is started and should remain constantly under the close supervision of the physician.

Again, under its section on warnings (a), the following appears:

> Careful instructions to and observation of the individual patient, are essential to the prevention of serious life-threatening adverse reactions. This is especially true in the aging (40 years and older) who have an increased susceptibility to the toxicity of the drug.

The only direct question asked of any witness concerning the overall warning given by Ciba-Geigy was asked of Dr. Grollman. Dr. Grollman was asked specifically as follows:

> Q: . . . [D]o you agree, basically, that Ciba-Geigy, in respect to its warning on the Sterazolidin, in your medical opinion and judgment, adequately warned Dr. Cooper concerning the indications, contraindications, warnings, precautions and adverse reactions with respect to the drug Sterazolidin?
>
> A: I do.
>
> Q: All right. Do you agree that the warnings that were in effect at the time the drug was prescribed, that you say would have been in the Physicians' Desk Reference, adequately warned Dr. Cooper with reference to the dangerous propensities of the drug Sterazolidin?

A: They do.

Q: Do you agree, again based on a reasonable medical probability, that the warning with respect to the drug Sterazolidin that was in effect at the time that Dr. Cooper prescribed it was of sufficient intensity to allow the doctor to carefully and adequately weigh the risks versus the benefits before determining whether or not to prescribe the drug?

A: Very definitely.

In his own testimony Dr. Cooper admitted that the warning given by Ciba-Geigy is adequate in all the following respects:

(1) to tell you that serious life-threatening adverse reactions can result from the use of Sterazolidin;

(2) that this drug Sterazolidin can cause severe and even fatal drug reaction;

(3) that Sterazolidin should be restricted to the treatment of one week's duration; [1]

(4) that Sterazolidin can have an effect on the eyes and vision;

(5) that this drug can cause a hearing loss; and

(6) that the drug can cause damage to the central nervous system.

In spite of his unequivocal approval of the adequacy of the manufacturer's warnings as contained in the PDR, Dr. Cooper in his brief contends that the information supplied by the manufacturer is inadequate with respect to the *time* within which adverse reactions or symptoms thereof could occur, because "... he *understood* these directions to apply only to long term use of the drug" (Emphasis added); that Ciba-Geigy failed to warn Dr. Cooper that the reaction of which plaintiff complained could occur within a few days or hours after taking Sterazolidin. Appellant also generally contends that the failure to warn Dr. Cooper was a producing cause of plaintiff's injuries.

There is no statement, indication nor implication in Ciba-Geigy's information furnished the physician on the use of Sterazolidin that the information applies only to long term use of the drug. Dr. Cooper's attempt in his brief to engraft the qualification that the warnings and information were "applicable only to long time use of the drug" is unwarranted and does not derive from the information, as the information itself is not so limited or qualified. Under the "important note" of the manufacturer's information the instruction was given that "[e]ach patient should be carefully evaluated before treatment is started and should *remain constantly under the close supervision of the physician*." (Emphasis added.)

We do not agree with Dr. Cooper's contention that the following testimony of Dr. Grollman is evidence of probative force that the warnings were inadequate:

Q: So what you are telling the jury is that it clearly states in the PDR under Indocin and Sterazolidin, that these symptoms of deafness, blindness, motor difficulty, etc. as Mr. Bowser had can occur within just a few days?

A: Right.

Q: And it is important for an adequate warning, in your overview of this case, that the PDR clearly state to the doctor this information, is it not?

A: It does. Do you mean if he reads it?

Q: Yes. Sir.

A: If he reads it, it does.

Q: Is it important that the PDR clearly state to the doctor that the symptoms can occur within just a few days?

A: It does state it. It is ...

Even if we assume, arguendo, that Ciba-Geigy gave an inadequate or defective warning, there is no evidence that such alleged deficiency was a producing cause of Mr. Bowser's injuries, i. e., there is no evidence that "but for" the inadequate information Mr. Bowser's injuries would not have occurred. After his initial visit on April 10, 1975, Mr. Bowser returned to Dr.

---

1. Dr. Cooper prescribed Sterazolidin for ten days.

Cooper's office on April 11, 12, 14, 15 and 18. During this time Dr. Cooper or his assistants had the opportunity of examining, observing and eliciting information regarding an adverse reaction to the drug. However, Dr. Cooper saw him only on the 18th, failed to see the drug reaction at that time, prescribed even more medication, and released him to return to regular work on April 21. On April 22 Mr. Bowser was admitted to the hospital by Dr. DeLeon, his family physician. Dr. Cooper states that if Mr. Bowser would have been having headaches, dizziness, muscle weakness or loss of hearing within the first two or three days after the medication was administered, then he would have discontinued the medication because he would have suspected a drug reaction. Thus, under Dr. Cooper's own testimony, any failure of the drug company to adequately warn him, if they did, that a drug reaction could occur within two or three days would not have been a producing cause of plaintiff's injuries.

Having carefully reviewed the record, we hold that the trial court properly granted Ciba-Geigy's motion for instructed verdict in that there is no evidence of probative force that Ciba-Geigy failed to provide adequate instructions, warnings and precautions regarding the use of the drug Sterazolidin. Furthermore, there is no evidence of probative force that such failure was a producing cause of Mr. Bowser's injuries. Appellant Cooper's second point of error is overruled.

The judgment of the trial court is affirmed.