HUMBLE SAND & GRAVEL,
INC., Petitioner,

v.

Raymond GOMEZ, et al., Respondents.

No. 01–0652.

Supreme Court of Texas.

Argued Oct. 30, 2002.

Decided Sept. 17, 2004.

Richard O. Faulk, Gardere & Wynne, Houston, for Amicus Curiae American Chemistry Council.

J. Wade Birdwell, Wallach Andrews Florsheim & Stouffer, P.C., Fort Worth, for Amicus Curiae Texas Association of Defense.

Dan Lambe, Austin, for Amicus Curiae Texas Watch.

Joe Michael Dodson, Dodson Law Office, P.C., Beaumont, P. Michael Jung, Strasburger & Price, L.L.P., Dallas, for petitioner.

Bob K. Monk, Lance P. Bradley, McPherson Monk Hughes Bradley Wimberley, Port Arthur, Darren Brown, John Andrew Cowan, Greg Thompson, Provost & Umphrey, Beaumont, Robert E. White, Childs Bishop & White, Odessa, Stephen D. Susman, Susman Godfrey, L.L.P., Houston, for respondent.

Justice HECHT delivered the opinion of the Court, in which Justice OWEN, Justice JEFFERSON, Justice SMITH, Justice WAINWRIGHT, and Justice BRISTER joined.

Generally, a product supplier must warn expected users of foreseeable risks that make the product unreasonably dangerous,[1] but a supplier need not warn of risks that are common knowledge,[2] and when the product is supplied through an intermediary, a supplier may sometimes rely on the intermediary to warn the actual product users.[3] We must apply these basic principles to the circumstances presented in this case. Specifically, the issue is whether a supplier of flint used for abrasive blasting had a duty to warn its customers' employees that inhalation of silica dust can be fatal and that they should

---

1. *See Crocker v. Winthrop Labs.*, 514 S.W.2d 429, 433 (Tex.1974); *Bristol-Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex.1978); *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 591 (Tex.1986); *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 426 (Tex.1997); Restatement (Second) of Torts §§ 388, 402A cmt. f (1965); Restatement (Third) of Torts: Products Liability § 2, cmt. i (1998).

2. *See Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex.1991); *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex.1995); *Grinnell*, 951 S.W.2d at 426–427; *Sauder Custom Fabrication, Inc. v. Boyd*, 967 S.W.2d 349, 349 (Tex.1998) (per curiam); Restatement (Second) of Torts §§ 388 cmt. k & 402A cmt. j (1965); Restatement (Third) of Torts: Products Liability § 2 cmt. j (1998).

3. *See Alm*, 717 S.W.2d at 591; Restatement (Second) of Torts §§ 388 cmt. n (1965); Restatement (Third) of Torts: Products Liability § 2 cmt. i (1998).

wear air-supplied protective hoods, given the customers' knowledge of those dangers.

■ If the flint supplier in this case had such a duty, it is only because all similarly situated flint suppliers have the same duty, not because of some peculiar aspect of this one defendant's situation. Therefore, to determine whether a general legal duty exists, we must look beyond the particular circumstances of the injury here complained of, just as the parties themselves have done, to the broader industrial setting in which that injury occurred. The record before us establishes that by the 1980s, the dangers of using flint in abrasive blasting had been well known throughout the abrasive blasting industry as well as to health and safety professionals and government regulators for most of the twentieth century, but that blasting workers themselves remained largely ignorant of those dangers, and their employers were careless in enforcing workplace conditions that would protect workers' safety. The record also reflects that federal regulations have been imposed on employers to improve working conditions but not on flint manufacturers to warn of dangers involved in the use of their product. While the parties here no longer dispute that such a warning by the defendant supplier would have prevented the plaintiff's injury, missing from this record is any evidence that, in general, warnings by flint suppliers could effectively reach their customers' employees actually engaged in abrasive blasting. Without such evidence, we are unable to determine whether a duty to warn should be imposed on flint suppliers. Consequently, we reverse the judgment of the court of appeals[4] and, in the interest of justice, remand the case to the trial court for a new trial.

4. 48 S.W.3d 487 (Tex.App.-Texarkana 2001).

## I

Raymond Gomez contracted silicosis while working at and around abrasive blasting (often but less accurately called sandblasting) for about 6½ years, from 1984–1987 and again from 1991–1994, at plants in Odessa, where he was born and raised, and in Corpus Christi, where his wife was from. In 1995, Gomez filed suit in Jefferson County against more than twenty defendants, including four suppliers of flint used as the abrasive in the blasting work, two suppliers of blasting equipment, thirteen suppliers of protective gear worn by workers, and several jobsite owners. Gomez settled with all of the defendants except Humble Sand & Gravel Company, one of the flint suppliers, for a total of $389,200, and then following a jury trial obtained a judgment against Humble for about $2 million. Much of the evidence relevant to the issues now before us was undisputed at trial, but where it was conflicting, we of course recite that which was most favorable to Gomez.

Gomez left school after the ninth grade because his wife was pregnant with their first child. Within the year, at age 18, he started work for Spincote Plastic Coating Co. in Odessa, where he stayed six months before moving to Corpus Christi to work at Spincote's plant there for three years. Spincote was in the business of using abrasive blasting to clean and condition oilfield tubing. This involved spraying steel tubing with particles of flint shot through a nozzle with compressed air under pressures around 100 p.s.i. Flint is very hard stone composed mostly of crystalline silica (silica dioxide ($SiO_2$), commonly called quartz), which in its natural, undisturbed state is not at all dangerous. But when flint particles are blasted against metal at high pressure, they not only scour and

abrade the surface, they shatter into an airborne dust of smaller particles. Some of this dust is coarse enough to rebound against workers, injuring exposed skin, and to hang in the air, obscuring visibility. But some particles of free silica are so fine—5 microns (or about 200 millionths of an inch) in diameter, something like 1/20th the diameter of a human hair—as to be invisible to the naked eye. The visible dust can clog the nose and mouth but is too coarse to be inhaled into the lungs and is relatively harmless. But the microscopic particles of free silica are both respirable and toxic. Inhaled over months or years, free silica particles cause silicosis, an incurable disease involving a fibrosis and scarring of the lungs and other complications that can eventually result in disability and death. Silicosis is caused only by inhaling free silica. Inhalation of free silica particles cannot be prevented by ordinary, loose-fitting, disposable paper masks; the particles are too small. People working around silica dust must wear airfed hoods or respirators covering their heads or faces to protect themselves.

The parties here agree, and the record establishes, that the health risks from inhaling silica dust have been well known for a very long time. One of Gomez's expert witnesses, Dr. Eula Bingham, former Assistant Secretary of Labor in charge of the Occupational Safety and Health Administration (OSHA) from 1977–1981, observed that Hippocrates (460–377 B.C.) linked respiratory disease to mining and stonemasonry, and that the first systematic treatise on occupational disease, *De Morbis Artificum,* written by Bernardino Ramazzini in 1700, identified silicosis as a pneumoconiosis ("a disease of the lungs caused by the habitual inhalation of irritant ... particles"[5]) common to stonemasons. Dr. Bingham and another of Gomez's expert witnesses, Dr. Vernon Rose, a certified industrial hygienist, testified that for more than 300 years silicosis has been treated as an occupational disease of flint knappers—workers who chip flint into desired shapes, such as gunflints.[6] The chipping releases free silica particles into the air. Both Dr. Bingham and Dr. Rose testified that the link between silicosis and abrasive blasting using silica flint was firmly established by physicians and public health officials in the United States and Europe in the early twentieth century.

A tragedy in the 1930s forced the attention of this nation and others to the dangers of silicosis. While constructing Hawk's Nest Tunnel through a mountain near Gauley Bridge, West Virginia, workers dug three miles through rock formations rich in silica. Hundreds died from silicosis and were buried nearby in unmarked graves, as Congressional hearings afterward revealed.[7] Several years later, according to Dr. Bingham, England banned the use of silica in abrasive blasting, and over time other European countries followed suit. Since these events, Dr. Bingham affirmed, it has been "well known throughout the medical and industrial worlds that [silicosis] is an occupational disease" associated with abrasive blasting. Dr. Rose agreed that "[t]his indisputable body of knowledge has been out there for all of industry and employers in the industrial workplace to know for a long time".

Studies of the health hazards of abrasive blasting with flint also determined that such work could be done relatively safely if

---

**5.** WEBSTER'S THIRD NEW INT'L DICTIONARY 1746 (1961).

**6.** *See* 8 THE OXFORD ENGLISH DICTIONARY 1061 (2d ed.1989).

**7.** *See* MARTIN CHERNIACK, THE HAWK'S NEST INCIDENT: AMERICA'S WORST INDUSTRIAL DISASTER 76–79, 90–96, 111 (1986).

workers were required to use suitable air line respirators—devices that fit over the face or head with a clean air supply for workers to breathe. Dr. Bingham and Dr. Rose testified that the American National Standards Institute, a consensus group made up of various industry participants including manufacturers, suppliers, employers, unions, and customers, first adopted safety standards calling for the use of respirators in abrasive blasting in 1938. OSHA regulations for abrasive blasting originally promulgated in the early 1970s also require the use of respirators, or air-fed hoods, "constructed [to] cover the wearer's head, neck, and shoulders to protect him from rebounding abrasive."[8] These regulations also require employers to develop written procedures for selecting respirators, to instruct employees in their use, to keep respirators clean and well-maintained, and to conduct frequent random inspections to ensure employee compliance.[9] Given these safety standards and regulations and the long-held concerns that led to their adoption, Dr. Rose testified that one "would expect a professional in ... the abrasive blasting industry to know about the hazards of abrasive blasting" and "the requirements to provide air-supplied respiratory equipment to the workers". Frank Bogran, a witness called by Gomez, who had run a major abrasive blasting business since 1962, agreed that "[b]y 1975 the people that were in that sandblasting industry, they knew about the hazards" and "knew about the need to wear proper air-fed equipment".

But their employees usually did not. The widespread knowledge of the dangers of silica dust produced by abrasive blasting and the necessity of wearing proper protective equipment was not often shared by the ordinary workers themselves or their supervisors and did not translate into safety in the workplace. It is undisputed on the record before us that the dangers of silicosis frequently went unheeded in practice. In 1974, the National Institute for Occupational Safety and Health sponsored a survey conducted by Boeing Aerospace Co. of some 400 businesses across the country "to determine the degree of respiratory protection currently afforded workers in industries which employ abrasive blasting techniques". The survey found the condition of respiratory equipment "generally deplorable". In many workplaces, respirators were ill-fitting, not cleaned or maintained, not supplied with clean air, or not regularly used by employees, and management was often "unaware of the inadequacy of their equipment." The survey report observed:

> The average firm safety man, where one exists—and this is usually a duty in addition to some normal "productive" function—seems unaware of the problems of respirable dust and noise.

> The average blaster seems unconcerned by equipment deficiencies. His trade has always been dusty and noisy.

The report concluded that—

> the persons responsible for selecting abrasive blasting respiratory protective equipment [for blasting workers] are none too informed nor interested in the subject. Their concern is with abrasive blasting per se and not with safety measures. A serious education effort is indicated.

Another study, begun at Tulane University's Medical Department in the early 1970s, showed that sandblasting in the Louisiana shipyards and on offshore drill-

---

8. 39 Fed.Reg. 23502, 23583 (June 27, 1974) (codified as 29 C.F.R. § 1910.94). *See id.* at 23671 (codified as 29 C.F.R. § 1910.134).

9. *Id.*

ing platforms occurred under similar conditions. The problems identified in these studies, according to Dr. Rose, were "pretty typical" throughout the industry in the 1970s and 1980s and were "occurring all over the country".

Humble, a relatively small, family-owned and -operated business with eight employees located in Picher, Oklahoma, began packaging and selling flint for abrasive blasting in 1982. Humble processed flint from chat (crushed rock) piles left over from World War II zinc-mining operations. Humble sold flint both in bulk and in 100–pound bags, and only to industrial customers. From the beginning, Ron Humble, who ran the business with his father, knew that breathing the silica dust generated by abrasive blasting could cause silicosis and that the disease could be fatal. He also knew that he should put some sort of warning label on the bags,[10] and after making inquiries of OSHA and a trade organization that yielded him no useful information, he decided to copy the following label used by a competitor, Independent Gravel, who he understood had been in business for more than fifty years:

### WARNING!

### MAY BE INJURIOUS TO HEALTH IF PROPER PROTECTIVE EQUIPMENT IS NOT USED.

Frank Bogran testified that his business had used a similar warning on bags it sold beginning in 1972, deliberately omitting to state that the health injury referred to could be death. Humble added a Spanish version in 1986 (at Spincote's request) and a French version (for Canadian customers) sometime later. In 1993, Humble began using the following more extensive warning on its bags:

### WARNING

### BREATHING DUST OF THIS PRODUCT CAUSES SILICOSIS, A SERIOUSLY DISABLING AND FATAL LUNG DISEASE.

### AN APPROVED AND WELL–MAINTAINED AIR–SUPPLIED ABRASIVE BLASTING HOOD MUST BE WORN AT ALL TIMES WHILE HANDLING AND USING THIS PRODUCT.

### FOLLOW ALL APPLICABLE OSHA STANDARDS.

Ron Humble testified that he had known all of the additional details in this warning since 1982 but had not included them earlier because he had simply copied Independent Gravel's warning.

Dr. Bingham and Dr. Rose approved of this latter warning but criticized the earlier one in the following two respects. First, the earlier warning understated the risk of inhaling silica dust by stating only that it "may be injurious to health" and not that it may result in disability and death. Second, the earlier warning did not specify that the only "proper protective equipment" was an air-fed hood, allowing the mistaken notion that other equipment, like disposable paper masks, would do as well.

In addition to the warning on its bags, Humble provided its customers a Material Safety Data Sheet (MSDS) as required by OSHA regulations.[11] The regulations prescribed the categories of information to be included but did not specify the information itself, so Humble again copied a form

---

10. *See* 29 C.F.R. § 1910.1200(a)(1) (purpose), (b)(1) (application), (f) (labels and other forms of warning), and (g) (material safety data sheets).

11. 29 CFR § 1910.1200(g) (1984).

used by Independent Gravel. The form included the following subcategories (on the left) and information supplied by Humble (on the right):

| Effects of Overexposure | Respiratory Disease may result from years of concentrated dust exposure without respiratory protection |
|---|---|
| Emergency and First Aid Procedures | Abrasive blast personnel should use only approved respirators |
| Hazardous Decomposition Products | Silica Dust |
| Respiratory Protection | Approved Respirator |
| Eye Protection | Yes—with air hood |

The MSDS, according to Dr. Bingham and Dr. Rose, suffered the same dual inadequacies as the bag label: it failed to emphasize the severity of the health hazard— that it could be fatal—and failed to specify that the respirator used should not just be "approved" but air-fed.

Humble also provided its customers with a sales leaflet it called a "technical fact sheet". Listed among its product's "important advantages" was: "Extremely low break-down rate, allowing material to be used over several times." Dr. Bingham and Dr. Rose criticized this encouragement of reuse because each time flint is used, more particles are broken down to respirable size, thereby posing a greater danger to workers.

Humble sold flint to Spincote for abrasive blasting at its Odessa and Corpus Christi plants. Although the record does not reflect the size of either plant, Dr. Rose testified that he understood Spincote was a subsidiary of ICO, Inc., a company with some 1,400 employees in Texas, California, Wyoming, and Oklahoma. Ken Gray, the general manager of the Spincote subsidiary in 1984, testified by deposition at trial. He acknowledged that it was Spincote's obligation to be aware of safety requirements, to provide a safe working environment including proper respiratory equipment, and to train its employees in safety procedures. He testified that he relied on applicable regulations for safety information and not on any supplier's warning label or MSDS. But Gray also

testified that in 1982, when he took over Spincote, he did not know that inhaling silica dust could cause silicosis; he knew only that silica dust was a nuisance and that breathing it was not healthy. He had himself, he said, walked through the dusty blasting building as often as twice a day without wearing any respiratory protection at all. As for when it was that he learned of regulations relating to abrasive blasting and that inhaling silica dust could result in silicosis and death, Gray expressed considerable uncertainty, indicating at various points that it was in the early 1980s, the mid–1980s, and maybe as late as December 1986. Gray did not know for sure whether Spincote's employees were ever told that inhaling silica dust could be fatal.

Eldon "Shorty" Workman, the Odessa plant manager in 1984, also testified at trial by deposition. He stated that he had worked in abrasive blasting in the 1950s and 1960s and that while he had always worn an air-fed hood, he had not become fully aware of the dangers of silicosis until after he had worked as a blaster for several years. By the time he became Spincote's plant manager he understood that breathing silica dust could lead to silicosis, an incurable lung disease, and death, and that it was his responsibility to provide employees with this information. He testified that Spincote's blasting employees were required to wear air-fed hoods, were reprimanded if they failed to do so, and were fired after three violations. Employees who worked around the dust but were

not actually operating blasting nozzles were only required to wear paper masks, not hoods. Workman was not asked why, if he was fully aware of the dangers, he did not require everyone working around the dust to wear hoods at all times. He stated that employees were required to attend regular safety meetings where they were warned of the dangers of silica dust and instructed in the use of protective equipment. Like Gray, however, Workman could not say definitely whether employees were ever told that inhaling silica dust could be fatal.

Abrasive blasting at Spincote's plants was done inside a building in an area called the blast house. Gomez was hired to work as an "end grinder", a job that did not involve blasting but was performed in the dusty environment of the building. Gomez was given only a disposable paper mask that was held against his face with rubber bands. After his first month, Gomez was moved to "end cutter", a job that did involve blasting. At that point, he was provided an air-fed hood in addition to the paper mask and was shown how to use the hood properly. The hood, he said, slipped over his head and fit like a turtleneck around his neck. It had an air supply hose that attached to the top and clear plastic front shields to see through that could be replaced as they became dirty. Gomez testified that the hoods he wore were not torn, did not allow dust inside, and were always in good condition. Humble offered testimony from one of Gomez's former co-workers that Spincote's hoods were torn, in bad condition, and dusty inside. But Gomez insisted that he never had any problems with his hood. He stated that he disassembled and washed it every week with soap and water.

However, Gomez and his former co-worker agreed that when blasting stopped for breaks during or at the end of a shift, employees had to remove their hoods to leave the blast house, even though the air was still dusty, because the hoses supplying air to the hoods would not reach past the immediate work area. Gomez also testified that he did not wear a hood when cleaning up the blast house, which involved shoveling back into the blasting machine's flint supply pot dust that had accumulated knee- and waist-deep. This activity stirred the dust, including free silica particles, back up into the air. Gray acknowledged that Spincote had twice been cited for excessive free silica particles in the work environment, and Gomez was exposed to them whenever he removed his hood and mask, even if the blasting had stopped.

At the end of each shift, according to Gomez, the workers would haul bags of flint from where they were stacked over to the blast area and empty them into the supply pot on the blasting machine. There is no evidence that this process generated free silica particles requiring workers to wear protective gear. Although Humble sold flint to some customers in bulk, the flint it sold to Spincote was always in 100–pound bags. Spincote also bought flint from other suppliers, some of which was in bags. Gomez testified that the first time he saw Humble's bags, he noticed the warning label and asked his foreman about it. His foreman replied that as long as he wore his hood and mask he would be all right. Gomez thought the phrase on the label, "injurious to health", meant that dust rebounding off blasted surfaces could hurt when it struck the skin and was bad to breathe. The hood, he thought, was for protection from the flying dust and the paper mask was to prevent inhalation. Still, he thought, the dust was ordinary dust, like what he might sweep out of his garage. He did not know that the dust contained invisible free silica particles too fine to be screened by a paper mask. Go-

mez also saw the following warning label on another supplier's bags:

**WARNING: CONTAINS FREE SILICA. DO NOT BREATHE DUST. May Cause Delayed Lung Injury, (Silicosis). Follow OSHA Safety and Health Standards for Crystalline Silica (Quartz).**

But Gomez testified that he did not ask his foreman about this warning and did not know what silicosis was. He did not know that silicosis or inhalation of free silica particles could lead to disability and death. Gomez testified that had he known how dangerous silica dust was, he never would have taken or kept a job working around it.

After Gomez left Spincote's Corpus Christi plant in 1987, he returned home to Odessa and did not work as an abrasive blaster again until 1991, when he went to work for Sivalls, Inc., another Odessa business. The blasting he did there was done outside on larger objects, but otherwise the work was much the same. There, as at Spincote, he testified he always wore his hood and mask when blasting but not at other times when he was around dust.

In November 1994, Gomez sought medical treatment for shortness of breath, and within a few days he was diagnosed as having subacute silicosis. A biopsy of his lung tissue confirmed that he had had a high exposure to silica dust. He left work at Sivalls and was never again employed in abrasive blasting. When Gomez's action against Humble went to trial nearly five years later in 1999, he had become licensed as a barber. Dr. Gary Friedman, board certified in internal medicine and occupational medicine, testified that while Gomez had suffered as yet few symptoms and no impairment, silicosis is a progressive disease, and given the extent and duration of his exposure, Gomez could expect significant disability within eight years and full disability within fifteen years. Dr. Friedman testified that a person with silicosis is also more susceptible to other respiratory diseases including tuberculosis, to autoimmune diseases including arthritis, and perhaps even to cancer. Dr. Friedman believed that Gomez, then 33, had a life expectancy of 20–25 years.

The trial court admitted evidence that Spincote and Sivalls used flint purchased from suppliers besides Humble, but it excluded Gomez's admissions, made in response to a discovery request, that other flint suppliers and equipment manufacturers and distributors that he had sued were responsible for his injury. The jury was asked only about Humble's and Gomez's responsibility. The jury found that Gomez's injury had been caused by a marketing defect in its flint, based on the following definitions taken verbatim from the *Texas Pattern Jury Charges*:

A "marketing defect" with respect to the product means the failure to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known or failure to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed.

"Adequate" warnings and instructions mean warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of the product's use; and the content of the warnings and instructions must be comprehensible to the average user and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person.

An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.[12]

The jury also found that Gomez's injury was caused by Humble's unspecified negligence but did not find that it was caused by his own negligence. The jury assessed the following damages: past physical pain, $5,000; future physical pain, $300,000; past mental anguish, $5,000; future mental anguish, $300,000; past lost wages, $18,000; future lost earning capacity, $500,000; future disfigurement, $10,000; future physical impairment, $500,000; past medical care, $17,000; and future medical care, $150,000. The jury also assessed $50,000 damages for each of Gomez's two children's future loss of parental consortium. The trial court rendered judgment on the verdict, excluding credits and including interest, for $2,053,058.76 for Gomez and $54,672.07 for each of his children.

On appeal, Humble did not challenge the jury's liability findings, including the inadequacy of its warning of the dangers of using flint in abrasive blasting. Rather, Humble argued that it had no duty to warn of those dangers because they were well known in the abrasive blasting industry, Humble sold only to industrial customers, and it was entitled to rely on them to provide their own employees, like Gomez, with all necessary information. A divided court of appeals rejected Humble's argu-

ment and affirmed the district court's judgment.[13]

We granted Humble's petition for review.[14] Two months later Gomez's counsel filed a suggestion of his death, the date and cause unstated.[15] We proceed as if Gomez remained a party to the appeal.[16]

## II

Humble argues here, as it did in the court of appeals, that a product supplier has no duty to warn its customers' employees of the risks of using the product if the customers should already know of those risks and are themselves obliged by law to warn their own employees. Awareness of risks, Humble contends, must be determined objectively in the context of the industry or business involved—what an ordinary person in that situation *should* know, not what one person or another actually *does* know. Humble argues that these issues should all be matters of law to be determined by the court, but that if they are matters of fact, then it was entitled to jury findings, which it requested and was denied. Humble also complains that it was not allowed to offer evidence at trial that Spincote intentionally caused, and other suppliers and products may have caused, Gomez's injury.

Gomez argues that regardless of anything Spincote should have done, Humble had a duty to warn him of two things: that inhaling silica dust could lead to disability and death, and that an air-fed hood should be worn around silica dust at all times. Employers like Spincote, Gomez contends, could not be relied on to provide these warnings. Regarding the exclusion of evi-

12. *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES & PRODUCTS PJC 71.5 (2002).

13. 48 S.W.3d 487 (Tex.App.-Texarkana 2001).

14. 45 Tex. Sup.Ct. J. 704 (May 30, 2002).

15. *See* TEX.R.APP. P. 7.1(a)(1).

16. *Id.*

dence of which Humble complains, Gomez argues that any error was harmless.

■ The jury found Humble liable under two separate legal theories: products liability and negligence. Although the jury's finding did not specify how Humble had been negligent, the only evidence of negligence that caused Gomez's injury was that Humble failed to adequately warn of the dangers of using flint in abrasive blasting. (There is no evidence, for example, that Humble's encouragement of the reuse of its product, though negligent, caused Gomez's injury.) Thus, the factual basis for liability under both theories was the same. While both legal theories impose, in certain circumstances, a duty on a supplier to warn of dangers in its product's use, the theories are not identical. Prod-

ucts liability focuses on the product; negligence focuses on the supplier's conduct.[17] We need not consider here any ramifications of the differences between the two theories because Gomez does not argue that Humble had a duty under one theory different from the duty under the other theory.[18] Therefore, we assume for present purposes that Humble's obligations under both theories are co-extensive.

■ It is firmly established in Texas that the existence and elements of a common law duty are ordinarily legal issues for the court to decide, whether the duty (for products liability) is not to distribute a defective product [19] or (for negligence) to act with ordinary care.[20] Not long ago we explained:

17. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex.1995) (" 'The care taken by the supplier of a product in its preparation, manufacture or sale, is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the acts of the manufacturer and determines if it exercised ordinary care in design and production.' ") (quoting *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871 (Tex.1978)).

18. *Cf. Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 741–742 (3d Cir.1990) (stating that in some jurisdictions the "sophisticated user defense"—that is, the rule that a supplier need not warn a sophisticated customer's employees of the risks of using a product—is available only in negligence actions and not in strict liability actions, but concluding that Ohio courts would apply the same rule in both kinds of actions).

19. *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex.1997) ("The existence of a duty to warn of dangers or instruct as to the proper use of a product is a question of law."); *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex.1996) ("In Texas, the existence of a duty to warn of the dangers of an alleged defective product is a question of law."); *General Motors Corp. v. Saenz*, 873

S.W.2d 353, 356 (Tex.1993) ("The existence of a duty to warn of dangers or instruct on proper use is a question of law."); *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 387 (Tex.1991) ("In Texas, the existence of a duty to warn of the dangers or instruct as to the proper use of a product is a question of law.").

20. *Texas Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex.2002) ("Whether a duty exists is a question of law for the court."); *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 351 (Tex.1995)("The existence of a legal duty is, of course, a question of law."); *Centeq Realty, Inc., v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995) ("The threshold inquiry in a negligence case is whether the defendant owes a legal duty to the plaintiff." "The existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question."); *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994) ("Whether a legal duty exists under a set of facts is a question of law."); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990) ("The threshold inquiry in a negligence case is duty." "[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question."); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983) (citing *Abalos v. Oil Dev. Co.*, 544 S.W.2d 627, 631 (Tex.1976)).

In deciding whether to impose a common-law duty, this Court has applied the familiar factors identified in *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex.1993), *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990), and *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983). The considerations include social, economic, and political questions and their application to the facts at hand. We have weighed the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. Also among the considerations are whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm.[21] We have recognized, however, that in some instances these issues may turn on facts that cannot be determined as a matter of law and must instead be resolved by the factfinder,[22] although we have actually identified only one such instance. Under the Federal Employers' Liability Act,[23] a railroad's duty to protect its employees from injury is measured by the foreseeability of harm, and while the issue of "whether a legal duty exists, including the foreseeability element, is typically a legal question [in FELA actions in Texas courts [24]] ..., if the essential facts about foreseeability as an element of the railroad's duty are disputed, the question is a fact issue for the jury." [25] We have had no other opportunity to consider the interplay of factual and legal determinations in deciding whether a duty exists and if so, what its parameters are.

█ Nor have we had occasion to consider how the burden of proving facts related to the existence of a duty should be assigned when those facts are in dispute. As a general rule, the plaintiff must establish the existence of a duty; [26] the burden is not on the defendant to show that it had no duty. Consistent with that rule, when the foreseeability of harm is an element of

---

**21.** *Praesel v. Johnson*, 967 S.W.2d 391, 397–398 (Tex.1998) (citations omitted).

**22.** *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395 (Tex.1991) ("The existence of a legal duty is a question of law for the court although in some instances it may require the resolution of disputed facts or inferences which are inappropriate for legal resolution.") (citing *Mitchell v. Missouri–Kansas–Texas R.R. Co.*, 786 S.W.2d 659, 662 (Tex.), *cert. denied*, 498 U.S. 896, 111 S.Ct. 247, 112 L.Ed.2d 205 (1990), *overruled on other grounds*, *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 169 (Tex.2002)).

**23.** 45 U.S.C. §§ 51–60 (2000).

**24.** *Mitchell*, 786 S.W.2d at 661–662 ("State law dictates whether the court or finder of fact should determine duty and its factual elements. While federal law governs the substantive rights of the parties in FELA cases, procedural matters are governed by applicable state rules when tried in state court. This court has recognized that 'rules relating to the form, *necessity*, and effect of jury issues are procedural rather than substantive if they do not interfere with a right or defense provided by the F.E.L.A.' As no substantive right or defense of the statute is affected by this determination, we look to the law of this state to resolve this issue.") (citations omitted).

**25.** *Union Pac. R.R.*, 85 S.W.3d at 166 (citation to *Mitchell* omitted).

**26.** *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex.1989) (stating that in an action for negligence "[t]he plaintiff must prove that there is a duty owed to him by the defendant"); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987) ("Duty is the threshhold inquiry; a plaintiff must prove the existence and violation of a duty owed to him by the defendant to establish liability in tort."); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983) ("In order to establish tort liability, a plaintiff must initially prove the existence and breach of a duty owed to him by the defendant.").

duty and factually disputed, as in the instance just mentioned, we have put the burden of proof on the plaintiff.[27] In this case, however, as will be seen, we must more carefully consider the application of the general rule.

Humble's argument has two components: one, it had no duty to warn its customers of the risks of working around silica dust because those risks were common knowledge in the abrasive blasting industry long before 1984; and two, it had no duty to warn its customers' employees of those risks because its customers were in a better position to warn their own employees. If the risks of silica dust were not commonly known in the industry, then Humble had at least a duty to warn its customers, which Gomez argues Humble did not do. Even if the risks were commonly known, the question remains whether Humble still had a duty to warn its customers' employees. We consider each component of Humble's argument in turn.

### III

A supplier has no duty to warn of risks involved in a product's use that are commonly known to foreseeable users, even if some users are not aware of them.[28] "Commonly" does not mean universally. "Commonly known" means " 'beyond dispute' ".[29] As we have said, "the inquiry whether a recognition of risk 'is within the ordinary knowledge common to the community' is an objective standard." [30] Thus, for example, in *Joseph E. Seagram & Sons, Inc. v. McGuire*, we concluded that "[f]rom ancient times, the danger of alcoholism from prolonged and excessive consumption of alcoholic beverages has been widely known and recognized" and is thus "common knowledge among the public", even though the plaintiffs in that case asserted that they were themselves personally unaware of this danger.[31] But in *American Tobacco v. Grinnell*, we concluded that while the general health risks of smoking were common knowledge, the specific risk of addiction continued to be disputed by the tobacco industry itself and thus could not be said to be common knowledge among smokers.[32] When the foreseeable users of a product have special training, a supplier has no duty to warn of risks that should be obvious to them, even if persons without such training would not appreciate the risks. For example, in *Sauder Custom Fabrication, Inc. v. Boyd*, we held that a scaffolding supplier had no duty to warn a boilermaker of the risk of falling because "[n]o ordinary person trained to do the work [he] and his crew were doing could have failed to appreciate the obvious risk".[33] What level of appreciation amounts to common knowledge is to be determined by the court as a matter of law unless there are factual issues that must be resolved.[34]

27. *Union Pac. R.R.*, 85 S.W.3d at 167.

28. *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex.1991); *see* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. j (1997) ("In general, a product seller is not subject to liability for failing to warn or instruct regarding risks and risk-avoidance measures that should be obvious to, or generally known by, foreseeable product users.").

29. *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 427 (Tex.1997) (quoting *Seagram*, 814 S.W.2d at 388).

30. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 383 (Tex.1995).

31. 814 S.W.2d at 388.

32. 951 S.W.2d at 427–428.

33. 967 S.W.2d 349, 351 (Tex.1998) (per curiam).

34. *Caterpillar*, 911 S.W.2d at 383.

■ With these principles in mind, we turn to the present case. Over fifty years ago, the United States Supreme Court observed: " 'It is a matter of common knowledge that it is injurious to the lungs and dangerous to health to work in silica dust, a fact which defendant [a railroad, the injured worker's employer] was bound to know.' " [35] Over ten years ago this Court noted: "Inhaling silica dust may cause respiratory disease, a risk that has been recognized for more than a century".[36] Consistent with these general observations, the record before us in this case establishes, and the parties do not disagree, that as a matter of objective fact, the general dangers of inhaling silica dust, including disability and death, and of not wearing air-fed hoods to protect against inhalation, have been common knowledge among flint suppliers and abrasive blasting operators for decades and were certainly so in 1984 when Gomez went to work for Spincote.[37] Humble admittedly knew of these dangers in 1982 when it began selling flint, and there is evidence that Spincote's Odessa plant foreman, Workman, knew of them as well, having worked for many years in the abrasive blasting industry.

The evidence that operators like Spincote were often careless in conducting abrasive blasting and insufficiently motivated to provide for the safety of their workers does not ascribe their indifference to inadequate warnings by flint suppliers. On the contrary, the evidence is that operators neglected safety *despite* their knowledge of the seriousness of silicosis and the standards, industrial and legal, for abrasive blasting. The 1974 Boeing and Tulane studies showed that operators were unaware, not of the serious dangers of working around silica dust or the need for protective equipment, but of the proper use of that equipment in the workplace— assuring that it fit tightly, was regularly cleaned and maintained, was supplied with clean air, and was routinely worn by employees. Gomez does not contend that flint suppliers should or could have instructed operators or workers in the proper use of protective equipment. The two warnings Gomez does contend Humble should have given were of dangers well known, though largely unheeded, in the abrasive blasting industry.

At the same time, it is equally well established on this record that the dangers of silica dust were not generally known to workers like Gomez employed in abrasive blasting operations. Workman, Spincote's foreman, testified that he had worked as a blaster for years before learning of the danger of silicosis. Gomez testified that when he first saw that word, he did not know what it meant. Gomez thought silica dust was like the dust he swept out of his garage. His and Workman's experiences were typical of the industry workforce.

From this record we conclude that flint suppliers like Humble had no duty to warn its customers like Spincote and Sivalls, abrasive blasting operators, that inhaling silica dust can be disabling and fatal and that workers must wear air-fed hoods, because that information had long been commonly known throughout the industry. Blasting operators' disregard of the risks to their employees of inhaling silica dust

**35.** *Urie v. Thompson,* 337 U.S. 163, 180, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (quoting *Sadowski v. Long Island R.R. Co.,* 292 N.Y. 448, 55 N.E.2d 497, 500 (1944)).

**36.** *Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 751 (Tex.1993).

**37.** *Cf. Gray v. Badger Mining Corp.,* 676 N.W.2d 268, 279–281 (Minn.2004) (concluding that there was evidence that a flint supplier's knowledge of the dangers of silica dust was superior to a blasting operator's).

was not for want of additional information that flint suppliers should have furnished, but for want of care. We turn, then, to the question whether Humble had a duty to warn its customers' employees, who were not generally aware of the risks.

## IV

### A

In *Alm v. Aluminum Co. of America,* we recognized that "a manufacturer or supplier may, in certain situations, depend on an intermediary to communicate a warning to the ultimate user of a product."[38] Alm claimed that an aluminum cap had popped off a soda bottle and struck him in the eye. Alcoa manufactured the machine that fastened the cap to the bottle top, and Alm claimed Alcoa should have warned him of the risk that a cap could pop off. But the machine Alcoa manufactured was owned and operated by an independent bottler. Alcoa did not control the bottling process or sell the bottled soft drink and had no practical way of reaching consumers with any warning. In that situation, we said, "Alcoa should be able to satisfy its duty to warn consumers by proving that its intermediary [the bottler] was adequately trained and warned, familiar with the propensities of the product, and capable of passing on a warning."[39] We analogized Alcoa's position to that of a bulk supplier of material that is repackaged and sold and who thus has no means of providing the ultimate consumer with a warning about risks of use.[40] In a different vein, we noted that other courts had held that a pharmaceutical manufacturer is not required to warn patients of the dangers of a prescription drug as long

as physicians who prescribe the drug— "learned intermediaries"—have been adequately warned.[41] In both situations, we said, it would be reasonable for the supplier to rely on the intermediary to warn the ultimate consumer. But we cautioned that—

> the mere presence of an intermediary does not excuse the manufacturer from warning those whom it should reasonably expect to be endangered by the use of its product. The issue in every case is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product.[42]

We concluded that while Alcoa had no duty to warn Alm directly, it did have a duty to warn the bottler and had failed to do so adequately.

Gomez argues that just as Alcoa failed to adequately warn the bottler, the intermediary between Alcoa and the ultimate consumers, Humble failed to adequately warn the employer/operator intermediaries between it and abrasive blasting workers. Gomez notes that the jury found Humble's warning inadequate, period, not just to Gomez. But any deficit in Humble's warnings to Spincote and Sivalls is inconsequential, since we have concluded that Humble had no duty to warn them at all because the risks of using flint that Gomez contends should have been warned about were common knowledge in their industry. In *Alm,* there was no argument that the risks of harm from caps misapplied by Alcoa's machine were common knowledge in the bottling industry. Alcoa had a duty to warn bottlers of the risks of use of its

---

**38.** 717 S.W.2d 588, 591 (Tex.1986).

**39.** *Id.* at 592.

**40.** *Id.*

**41.** *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 6 cmt. b (1998).

**42.** *Alm,* 717 S.W.2d at 591.

machine even though it had no duty to warn consumers. Humble is in the opposite position: it had no duty to warn abrasive-blasting operators of the risks of harm involved in abrasive blasting but may have had a duty to warn their employees, the end users of its product.

*Alm* cited but did not discuss section 388 of the *Restatement (Second) of Torts,* which sets out a rule similar to the one applied in *Alm:*

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel . . . if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.[43]

A product supplier's responsibility under section 388 may extend only to its customers, or it may reach its customers' employees. If section 388 governed the present case and were applied literally, Humble would clearly have had no duty to warn Gomez because the record disproves the second element, (b): Humble had *every* reason to believe that Spincote knew of the dangers of using flint in abrasive blasting, since they were common knowledge in the

industry, and at least *some* reason to believe that Spincote would communicate its knowledge to Gomez, since it was required by law to do so, even though many such operators did not warn their employees. It cannot fairly be said that Humble had *no* reason to believe that abrasive blasting workers would be told the dangers of silica dust. Humble and amici curiae[44] argue that this should be the end of our analysis.

We think the argument is much too broad. Spincote's legal obligation to warn Gomez, Humble contends, derived partly from an employer's common law duty to warn employees of the hazards of their employment.[45] Were this common law duty, shared by all employers, enough to justify Humble's reliance on Spincote to warn its employees, no supplier would ever be required to warn its customers' employees of product risks of which its customers should have been aware. Warning an employer intermediary would always be good enough, and our discussion of the appropriateness of such a warning in *Alm* would have been unnecessary. We have been cited no authority for such a blanket exemption from the general duty to warn the ultimate users of a product of dangers involved in its use, and we are aware of none. Humble argues that in addition to its common law responsibility, Spincote had more specific legal obligations toward its employees—those imposed by detailed OSHA regulations on all abrasive blasting operators. But these regulations were neither so customarily followed nor so rig-

---

**43.** RESTATEMENT (SECOND) OF TORTS § 388 (1965).

**44.** Amici curiae in support of Humble's position are Unimin Corp., the American Chemistry Council, the Texas Chemical Council, and the Texas Association of Defense Counsel.

**45.** *See Farley v. M M Cattle Co.,* 529 S.W.2d 751, 754 (Tex.1975) ("It is well established

that an employer has certain nondelegable and continuous duties to his employees. Among these are the duty to warn employees as to the hazards of their employment and to supervise their activities, the duty to furnish a reasonably safe place in which to labor and the duty to furnish reasonably safe instrumentalities with which employees are to work.").

idly enforced that flint suppliers could thereby reasonably expect workers to be mindful of the dangers of silica dust. Indeed, on the record before us the opposite is true. Accordingly, we are not persuaded that this case can be decided using the literal language of section 388.

The black-letter rule of section 388 seriously understates the subtlety of the matter, as comment n to the provision, which we quote at length, elaborates:

Chattels are often supplied for the use of others, although the chattels or the permission to use them are not given directly to those for whose use they are supplied, as when a wholesale dealer sells to a retailer goods which are obviously to be used by the persons purchasing them from him, or when a contractor furnishes the scaffoldings or other appliances which his subcontractor and the latter's servants are to use, or when an automobile is lent for the borrower to use for the conveyance of his family and friends. In all such cases the question may arise as to whether the person supplying the chattel is exercising that reasonable care, which he owes to those who are to use it, by informing the third person through whom the chattel is supplied of its actual character.

Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it. All sorts of chattels may be supplied for the use of others, through all sorts of third persons and under an infinite variety of circumstances. This being true, it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe. There are, however, certain factors which are important in determining this question. There is necessarily some chance that information given to the third person will not be communicated by him to those who are to use the chattel. This chance varies with the circumstances existing at the time the chattel is turned over to the third person, or permission is given to him to allow others to use it. These circumstances include the known or knowable character of the third person and may also include the purpose for which the chattel is given. Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so. If the chattel is one which if ignorantly used contains no great chance of causing anything more than some comparatively trivial harm, it is reasonable to permit the one who supplies the chattel through a third person to rely upon the fact that the third person is an ordinary normal man to whose discredit the supplier knows nothing, as a sufficient assurance that information given to him will be passed on to those who are to use the chattel.

If, however, the third person is known to be careless or inconsiderate or if the purpose for which the chattel is to be used is to his advantage and knowledge of the true character of the chattel is likely to prevent its being used and so to

deprive him of this advantage—as when goods so defective as to be unsalable are sold by a wholesaler to a retailer—the supplier of the chattel has reason to expect, or at least suspect, that the information will fail to reach those who are to use the chattel and whose safety depends upon their knowledge of its true character. In such a case, the supplier may well be required to go further than to tell such a third person of the dangerous character of the article, or, if he fails to do so, to take the risk of being subjected to liability if the information is not brought home to those whom the supplier should expect to use the chattel. In many cases the burden of doing so is slight, as when the chattel is to be used in the presence or vicinity of the person supplying it, so that he could easily give a personal warning to those who are to use the chattel. Even though the supplier has no practicable opportunity to give this information directly and in person to those who are to use the chattel or share in its use, it is not unreasonable to require him to make good any harm which is caused by his using so unreliable a method of giving the information which is obviously necessary to make the chattel safe for those who use it and those in the vicinity of its use.

Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them, and the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result. Since the care which must be taken always increases with the danger involved, it may be reasonable to require those who supply through others chattels which if ignorantly used involve grave risk of serious harm to those who use them and those in the vicinity of their use, to take precautions to bring the information home to the users of such chattels which it would be unreasonable to demand were the chattels of a less dangerous character.

Thus, while it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it unless he knows that the other is careless, it may be improper to permit him to trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of whose character he knows nothing. It may well be that he should take the risk that this information may not be communicated, unless he exercises reasonable care to ascertain the character of the third person, or unless from previous experience with him or from the excellence of his reputation the supplier has positive reason to believe that he is careful. In addition to this, if the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful. Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character. Where the danger involved in the ignorant use of their true quality is great and such means of disclosure

are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them.[46]

It is important to note that while comment n is written in terms of *a* supplier supplying through *a* third person, rarely does distribution of a product involve but two participants. More commonly, many suppliers supply through many third persons. Certainly that is true of flint supplied to the abrasive-blasting industry. When there are multiple suppliers and multiple intermediaries, all typical in important respects, comment n cannot be read to prescribe an analysis of legal duty individualized supplier by supplier or intermediary by intermediary, with the result that some suppliers are obliged to warn some end users but not others, while other suppliers need provide no warning at all. Here, for example, whether Humble had a duty to warn abrasive blasters cannot turn on whether their respective employers were especially careful or reckless. To require Humble and each other flint supplier to investigate every customer's own appreciation of the dangers of abrasive blasting would be impractical if not entirely impossible. Comment n imposes no such duty to investigate. Rather, in such an industry, the issue to be determined in light of the considerations set out in comment n is not whether Humble had a duty to warn Gomez, but whether flint suppliers had a duty to warn abrasive blasters generally, given the nature of the industry. This is an important point to which we return below.

Section 388 and comment n describe a duty of ordinary care that is mirrored in products liability law. Section 2(c) of the *Restatement (Third) of Torts: Products Liability* states that a product—

is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.[47]

Were we to apply section 2(c) as literally as Humble argues section 388 should be applied, then Humble would certainly be liable to Gomez because he would have avoided the foreseeable risk of silicosis had Humble warned that inhaling silica dust could result in death. Gomez's testimony, which the jury could and obviously did believe, establishes that he would have seen such a warning, just as he saw the warning that Humble did print on its bags, would have understood it, and would never have continued working as a blaster. But the comments to section 2, like those to section 388, show that the stated rule cannot be so mechanically applied. Comment i explains:

There is no general rule as to whether one supplying a product for the use of others through an intermediary has a duty to warn the ultimate product user directly or may rely on the intermediary to relay warnings. The standard is one of reasonableness in the circumstances. Among the factors to be considered are the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user. Thus, when the purchaser of machinery is the owner of a workplace who provides the machinery to

---

46. RESTATEMENT (SECOND) OF TORTS § 388, cmt. n (1965) (citations omitted).

47. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(c) (1998).

employees for their use, and there is reason to doubt that the employer will pass warnings on to employees, the seller is required to reach the employees directly with necessary instructions and warnings if doing so is reasonably feasible.[48]

Although comment i is much shorter than comment n, the reporters' notes indicate that no substantive difference was intended:

The Restatement, Second, of Torts § 388, Comment *n*, utilizes the same factors set forth in Comment *i* in deciding whether a warning should be given directly to third persons. It has been relied on by numerous courts.[49]

Comment i distills down to three non-exclusive factors the considerations set out at length in comment n for determining when a warning to an intermediary is sufficient. A number of courts, beginning with the federal district court in *Goodbar v. Whitehead Bros.* in 1984,[50] a case involving silica products, have identified six non-exclusive factors in comment n:

(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users.[51]

We should point out that neither comment n, comment i, nor any of the cases applying them suggests that the scope of a supplier's duty to warn the ultimate users of its product can be determined simply by counting up the factors for and against allowing a warning to be given to an intermediary instead. Rather, the various considerations must be weighed against each other, the measure being reasonableness in the circumstances, as both comments state and as we said in *Alm*.

■ Gomez contends that it is never reasonable to excuse a supplier from warning ultimate users directly about product dangers whenever a warning is feasible. The determinative factor in *Alm*, Gomez argues, was that it was utterly impossible for a bottle capping machine manufacturer to warn soft drink consumers with whom it had no means of direct contact of the danger of exploding bottle caps. That, Gomez continues, is why *Alm* analogized Alcoa's position to a bulk supplier, who likewise has no packaging or other medium on which to place a warning that will reach the ultimate users of the product. But *Alm* cannot fairly be read so strictly. *Alm* also compared Alcoa's position to that of pharmaceutical manufacturers, who are not required to warn patients regarding usage of prescription drugs as long as physicians have been duly warned. The rationale for this "learned intermediary" rule is not that a direct warning from manufacturers to patients is infeasible, in

---

48. *Id.* cmt. i.

49. *Id.* cmt. i.5 (Reporters' Note, at 96) (citations omitted).

50. 591 F.Supp. 552 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985).

51. *Goodbar*, 591 F.Supp. at 557; *see, e.g., Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 739–740 (3d Cir.1990); *Willis v. Raymark In-*

*dus., Inc.*, 905 F.2d 793, 796 (4th Cir.1990); *Baker v. Monsanto Co.*, 962 F.Supp. 1143, 1151 (S.D.Ind.1997); *In re TMJ Implants Prods. Liab. Litig.*, 872 F.Supp. 1019, 1020 (D.Minn.1995); *Sara Lee Corp. v. Homasote Co.*, 719 F.Supp. 417, 421 (D.Md.1989); *Eagle–Picher Indus., Inc. v. Balbos*, 326 Md. 179, 604 A.2d 445, 464 (1992); *Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 751 N.E.2d 848, 856 (2001).

the practical, physical sense of that word, but that it is better for the patient for the warning to come from his or her physician.[52] We have never suggested, in *Alm* or elsewhere, that the sole factor in determining a product supplier's duty to warn is feasibility. The *Restatement* provisions we have quoted certainly do not do so.

Even if a product supplier's duty to warn the ultimate users does not depend solely on the feasibility of doing so, Gomez insists that it is never reasonable to depend on an employer to warn its employees. An employee cannot rely on an employer, Gomez argues, the way a patient relies on a physician. But the differences in the two relationships do not themselves dictate whether it is ever reasonable for a supplier to rely on an employer to warn its employees in the use of a product. A number of courts have found such reliance appropriate in various circumstances.[53] Based on these cases and the *Restatement*

provisions we have cited, we think that the relationship between a supplier, an intermediary, and the ultimate user is but one factor to consider in deciding the scope of the supplier's duty to warn.

To the considerations derived from the *Restatement* provisions we add those which we have said inform any decision whether to recognize a common law duty, inasmuch as the decision whether to require a warning to ultimate users in addition to a warning to intermediaries is for us one of legal duty. As we explained above, the considerations in determining duty include "social, economic, and political questions", "the risk, foreseeability, and likelihood of injury", "the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury," "the consequences of placing the burden on the defendant", and "whether one party would generally have superior knowledge

**52.** *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 6 cmt. b ("The rationale supporting this 'learned intermediary' rule is that only health-care professionals are in a position to understand the significance of the risks involved and to assess the relative advantages and disadvantages of a given form of prescription-based therapy. The duty then devolves on the health-care provider to supply to the patient such information as is deemed appropriate under the circumstances so that the patient can make an informed choice as to therapy.").

**53.** *See, e.g., Duane v. Oklahoma Gas & Elec. Co.,* 833 P.2d 284, 287 (Okla.1992); *City of Jackson v. Ball,* 562 So.2d 1267, 1270 (Miss. 1990); *Washington v. Dep't of Transp.,* 8 F.3d 296, 300–301 (5th Cir.1993) (holding under Louisiana law that the manufacturer of an industrial shop vacuum had no duty to warn its customers employees of the danger of using electrical equipment around acetone vapors); *Davis v. Avondale Indus., Inc.,* 975 F.2d 169, 172–173 (5th Cir.1992) (holding under Louisiana law that jury should have been instructed that a welding rod manufacturer had no duty to warn a sophisticated

user's employee of the dangers of using the product); *Cook v. Branick Mfg., Inc.,* 736 F.2d 1442, 1446 (11th Cir.1984) (holding under Alabama law that tire rim manufacturer was not required to warn customer's employees to use safety pin); *Marshall v. H.K. Ferguson Co.,* 623 F.2d 882, 886–887 (4th Cir.1980) (stating that the defendant, who designed and constructed a brewery, had no duty to warn the employees of the owner and operator regarding the operation of the brewery); *Martinez v. Dixie Carriers Inc.,* 529 F.2d 457, 466 (5th Cir.1976); *Jacobson v. Colorado Fuel & Iron Corp.,* 409 F.2d 1263, 1272–1273 (9th Cir.1969); *Byrd v. Brush Wellman, Inc.,* 753 F.Supp. 1403, 1405, 1413 (E.D.Tenn.1990); *Singleton v. Manitowoc Co.,* 727 F.Supp. 217, 225–226 (D.Md.1989); *Higgins v. E.I. DuPont de Nemours, Inc.,* 671 F.Supp. 1055, 1058–1059 (D.Md.1987); *Morsberger v. Uniking Conveyor Corp.,* 647 F.Supp. 1297, 1299 (W.D.Va.1986); *Goodbar v. Whitehead Bros.,* 591 F.Supp. 552, 559 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985); *see* also Joel Slawotsky, *The Learned Intermediary Doctrine: The Employer as Intermediary,* 30 Tort & Ins. L.J. 1059, 1060 (1995).

of the risk or a right to control the actor who caused the harm." [54] We take all of these factors into account in determining the scope of Humble's duty to warn.

## B

Based on all of the considerations that have been set out, whether a flint supplier had a duty to warn abrasive blasting operators' employees during the time frame that Gomez was employed that inhaling silica dust could result in disability and death and that an air-fed hood should be worn around silica dust at all times depends, we think, on the following factors. As we have already said, these factors must be applied to the abrasive blasting industry as a whole, not merely to Humble, Spincote, and Gomez individually.

*1. The likelihood of serious injury from a supplier's failure to warn.*

Silicosis, unquestionably a serious injury, is likely to result from working around silica dust without properly using protective equipment. Whether such injury was also likely to result from a supplier's failure to warn workers of the seriousness of silicosis and the importance of wearing an air-fed hood is far from clear on the record before us. For one thing, the record does not reflect whether flint was supplied mostly in bags or in bulk, or whether some operators purchased flint only in bags (Spincote purchased both in bags and in bulk). There is no evidence that it was feasible for bulk sellers to warn their customers' employees, and several courts have held that there is no duty to do so. [55] None has held to the contrary. If in fact flint was supplied mostly in bulk, without warnings, then the likelihood of injury due to inadequate warnings on bags, as opposed to no warnings at all on bulk deliveries, may have been small. Furthermore, there is no evidence that any abrasive blasting worker other than Gomez ever saw a warning label on a bag of flint. Gomez's fellow employee did not testify whether he had ever seen such labels. The record is completely silent on whether it was common in the industry for blasting workers to handle bags. Thus, it is unclear whether warnings printed on bags could ordinarily have been expected to reach blasting workers. Even if blasting workers ordinarily saw bag labels, there is some suggestion at least that the warnings would have been ineffectual, that they would have continued on in their jobs out of economic necessity. Although Texas law presumes that an adequate warning will be followed, the presumption is rebuttable. [56] There is no question, of course, that Gomez would have escaped injury had Humble's bags borne an adequate warning label; he so testified, and the jury believed him. But as we have already explained, the inquiry for purposes of determining duty must be an objective one with a view of the industry as a whole. A supplier with a duty to warn is liable for each injury caused by its failure to do so. Whether such a duty exists, however, depends in part on whether injury in general

**54.** *Praesel v. Johnson*, 967 S.W.2d 391, 397–398 (Tex.1998).

**55.** *Bergfeld v. Unimin Corp.*, 319 F.3d 350, 354 (8th Cir.2003) (applying Iowa law); *Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 740–742 (3d Cir.1990) (applying Ohio law); *Damond v. Avondale Indus., Inc.*, 718 So.2d 551, 552–553 (La.Ct.App.1998), *writ denied*, 735 So.2d 637 (La.1999); *Phillips v. A.P.*

*Green Refractories Co.*, 428 Pa.Super. 167, 630 A.2d 874, 882–883 (1993), *aff'd on other grounds*, 542 Pa. 124, 665 A.2d 1167 (1995); *Haase v. Badger Mining Corp.*, 266 Wis.2d 970, 669 N.W.2d 737, 743–745 (2003); *Goodbar*, 591 F.Supp. at 561.

**56.** *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 358–359 (Tex.1993).

is likely to result from the absence of a warning.

On the record before us, nothing more can be said than that *one* supplier's failure to warn *one* worker increased the likelihood of *his* injury. A legal duty resulting in enormous liability cannot be imposed on an entire industry on the basis of a fluke. It may be that, in general, a supplier's failure to print more specific warnings on bags of flint significantly increased the likelihood of serious injury, but there is nothing in the record either to support or contradict that proposition.

*2. The burden on a supplier of giving a warning.*

The record establishes that the burden on a supplier of flint in bags is either inconsequential or nonexistent.

*3. The feasibility and effectiveness of a supplier's warning.*

It was obviously feasible for suppliers to print warning labels on bags, but it is not clear from the record before us whether such labels would have reached blasting workers or would have reduced the risk of silicosis if they had. The feasibility of printing words on a bag is not in any doubt, but the feasibility of using that medium to communicate any meaningful warning effectively is. Gomez testified that he would never have worked as a blaster had he known the seriousness of the risks, but his expert testified that it is possible to avoid those risks by proper use of protective equipment. Gomez does not contend that flint suppliers could have provided adequate information regarding the proper use of safety equipment. The most a supplier should have done, according to Gomez and the expert witnesses who testi-

fied for him, was to warn that exposure to silica dust can be deadly and that an air-fed hood should always be worn. It is important to note that neither of the two 1974 studies cited by Gomez to show conditions in the abrasive blasting industry suggested that exposure to free silica was due to the lack or inadequacy of warnings by suppliers, or that better supplier warnings would have alleviated the problem. Both studies concluded that safe working conditions were up to employers. A warning that could not provide useful safety information was of limited utility.

*4. The reliability of operators to warn their own employees.*

Although abrasive blasting operators knew the dangers of working around silica dust, were in a far better position than flint suppliers to warn their own employees of those dangers, and could have reduced or eliminated altogether the risk of silicosis by following federal regulations, the record establishes that they routinely neglected safety measures and did not warn employees. There is no indication that the burden of such measures on operators was great. But while the evidence shows that operators often could not be relied upon to enforce safe conditions in the work place, there is no evidence that any government agency or industrial safety group ever considered that safety could be improved by suppliers' warnings.

*5. The existence and efficacy of other protections.*

The existence of a comprehensive regulatory scheme to protect against harm weighs against imposing a common law duty to accomplish the same result if the scheme affords significant protections.[57]

**57.** *Mission Petroleum Carriers, Inc. v. Solomon,* 106 S.W.3d 705, 714–715 (Tex.2003) (holding that a common law duty to use ordinary care in taking urine specimens for drug

tests should not be imposed on employers when there is a "comprehensive statutory and regulatory scheme" already in place that "af-

OSHA regulations prescribed standards for abrasive blasting that were legally enforceable against operators and that, if followed, would have provided safe working conditions. But the evidence is overwhelming that the regulations were widely disregarded and as a practical matter, afforded workers little protection.

*6. The social utility of requiring, or not requiring, suppliers to warn.*

Requiring suppliers to warn would avoid some injuries, including Gomez's, but shifting responsibility away from operators might lessen even further their incentives to provide a safe working environment, ultimately resulting in injuries to more workers than if warnings were not given. *On balance:*

█ We cannot determine from this record that a duty should be imposed on flint suppliers like Humble to provide their customers' employees the limited warnings Gomez argues should have been given. "An ideal tort system should impose responsibility on the parties according to their abilities to prevent the harm." [58] If most of the harm to abrasive blasting workers was due to the use of flint supplied in bulk, it would be a perverse result if the responsibility for injury fell solely on those doing the least harm—suppliers who sold flint in bags. If abrasive blasting workers do not ordinarily see bag labels, it would do little good to require that the labels be more specific. And if abrasive

blasting operators persistently require their employees to work in unsafe conditions, it is not clear that the purposes of imposing a duty to warn—encouraging care and protecting users—can be advanced by requiring flint suppliers to warn that those conditions are indeed unsafe. We say "if" because these matters remain in doubt based on the evidence before us.

By the same token, we cannot say from the record that a duty to warn should *not* be imposed on flint suppliers. We must determine what result is appropriate in such a case.

## C

Courts have variously referred to the argument that a product supplier should not be required to warn knowledgeable customers or their employees of risks of use as the sophisticated user "doctrine" or "defense".[59] While "doctrine" does not indicate whether the issue is one of duty or avoidance, "defense" implies the latter with the burden of proof on the supplier. As we have analyzed this case, we think the question presented is one of duty. Other courts have taken the same approach.[60] As noted above, the burden of showing the existence and scope of a duty is ordinarily on the plaintiff.[61]

█ At bottom, our principal concern with imposing a duty on Humble and other suppliers of flint in bags is that the warning Gomez contends should have been giv-

fords significant protection to employees who are the subject of random drug tests.'').

**58.** *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 425 (Tex.1984).

**59.** *E.g., Bergfeld v. Unimin Corp.*, 319 F.3d 350, 353–354 (8th Cir.2003); *Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 741 (3d Cir.1990); *Damond v. Avondale Indus., Inc.*, 718 So.2d 551, 552–553 (La.Ct.App.1998), *writ denied*, 735 So.2d 637–638 (La.1999); *Phillips v. A.P.*

*Green Refractories Co.*, 428 Pa.Super. 167, 630 A.2d 874, 882–883 (1993), *aff'd on other grounds*, 542 Pa. 124, 665 A.2d 1167 (1995); *Haase v. Badger Mining Corp.*, 266 Wis.2d 970, 669 N.W.2d 737, 743–745 (2003); *Goodbar*, 591 F.Supp. at 561.

**60.** *Id.*

**61.** *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166–168 (Tex.2002).

en would have been inefficacious for the several reasons we have explained. "The issue," as we said in *Alm*, "is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product." [62] It is precisely this issue that cannot be resolved on the record in this case. We think the burden should have been on Humble to show that the warning Gomez contends flint suppliers should have given would not have been effectual. This is appropriate, even though proof of duty is usually the plaintiff's responsibility, for several reasons. First, in most circumstances a supplier's duty to warn is simply assumed; the availability of the warning to end users is not in question. Circumstances in which that assumption is not warranted, as when sales are in bulk or there is an intermediary who should have the duty to warn, seem more the exception than the rule. Indeed, in this case it is not apparent that a supplier's warning would *not* reach end users; it is just not apparent that it *would.* Second, the record in this case is sufficiently descriptive of the nature of the abrasive blasting injury for us to conclude that evidence regarding the efficacy or inefficacy of a supplier's warning in the blasting workplace, in general, is likely to be more readily available to a supplier than a worker. Of course, a worker would know first-hand, and therefore better than a flint supplier, the conditions in the environment in which he himself worked, but he could not be expected to have access to information about other workplaces. A supplier would have easier access to information from his customers than a stranger. As already stated, we do not suggest that a supplier has any duty to investigate his customers' operations to avoid liability. The issue here is only whether suppliers have better access to information about how their product is used among their customers than one customer's employee. Third, as we have said, other cases tend to treat the intermediary issue generally as defensive, and while they do not analyze why that should be the case, we think it is better to have a uniform rule on the issue. Thus, we conclude that the burden was on Humble to demonstrate that, based on the factors we have set out, the legal duty that a supplier ordinarily has to warn end users of product dangers should not be imposed on suppliers of flint in bags to warn abrasive blasters of two specific dangers: that airfed hoods or respirators should be used around blasting areas at all times, and that the failure to do so can result in a disease that is fatal. As with all determinations of legal duty in Texas, the issue is one for the court unless the relevant facts are disputed.

The fact that a warning by Humble would have reached Gomez does not, by itself, in the context of the industry involved here, support an inference that all flint suppliers should have a legal duty to warn all abrasive blasters. By the same token, the silence of the record concerning the general efficacy of such warnings does not support an inference that imposition of a duty is not justified. Because the parties have not focused on the issue we think is crucial, we conclude that the interests of justice would be best served by a new trial. As we have explained, if the evidence relevant to this issue is undisputed, the trial court should determine duty as a matter of law, but if the evidence is in conflict, that conflict should first be resolved by the finder of fact and then the duty issue determined.

Having come to this conclusion, we need not reach Humble's argument that the tri-

---

**62.** *Alm v. Aluminum Co. of Am.,* 717 S.W.2d   588, 591 (Tex.1986).

al court erred in excluding evidence that Spincote injured Gomez intentionally or that other suppliers were responsible for Gomez's injury.

## V

We add a few words in response to the dissent.

██ The dissent argues that we have violated the "fundamental premise" of *Alm* that "a product manufacturer has a duty to inform users of potential hazards associated with the product".[63] "As applied by the Court today," the dissent inveighs, "the sophisticated-user exception swallows the rule, absolving manufacturers of the duty to warn even when the product is admittedly dangerous and the manufacturer could easily provide an effective warning."[64] This simply is not true. The key word is "effective": we cannot tell from the record before us whether a flint supplier could ever have supplied an effective warning to anyone other than Gomez. While we certainly do not demean the importance of that warning to him, the analysis we have long used to determine whether a legal duty exists requires a consideration of the entire context and not merely one individual situation. As the dissent reiterates, we said in *Alm* that "[t]he issue in every case is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product."[65] It is impossible to say from this record whether any flint supplier ever had any reasonable assurance that a warning on a bag would reach abrasive blasters. We do not require, as the dissent accuses, that a flint supplier's warning be "read by every possible person using the product".[66] But a prerequisite to imposing a duty to warn is a significant likelihood that serious injury be avoided. The dissent says that "[w]hile Humble might be able to argue under different circumstances that its warning would not likely reach most users, the facts here belie any such concern." To the contrary, the facts here *establish* that concern.

The dissent suggests that Humble should have warned Spincote more specifically of the dangers of using flint in abrasive blasting, but Spincote knew as much as, and acted like, the rest of the industry. The dissent asks: "how can it be conclusively presumed that the 'industry' knew" the dangers of abrasive blasting.[67] The answer is that Gomez proved it himself, that we are obliged by the jury verdict to credit his evidence, and that Humble did not dispute it. In any event, what Spincote knew, and whether it could be depended upon to warn its employees, have nothing to do with whether Humble and other flint suppliers could effectively warn those same employees. The dissent complains that "Humble took no steps to determine Spincote's level of knowledge concerning silica's dangers."[68] The idea that product suppliers must investigate every customer's awareness of dangers and tailor a warning to fit each one is certainly impractical, as we have explained, and radical at least in the sense that the dissent offers no authority in support of a general duty to investigate customers. That Humble's statements to Spincote in its MSDS and "technical fact sheet" may not have been

**63.** *Post* at 198.

**64.** *Post* at 199.

**65.** *Post* at 198 (quoting *Alm,* 717 S.W.2d at 591).

**66.** *Post* at 201.

**67.** *Post* at 201.

**68.** *Post* at 202.

as clear as they should have been is of no consequence. Gomez does not even contend that he would not have been injured if only Humble had given Spincote better information.

Finally, the dissent says:

Breathtaking in scope, the Court's decision today ventures where *no court has gone before*, adopting confusing and legally immaterial evidentiary proof requirements to re-examine whether a duty that we have long recognized exists in the first instance.[69]

The requirements for imposing a legal duty are hardly immaterial; they are precisely the same as for imposing a duty in any other context. Where "no court has gone before" would be to hold a flint supplier liable for failing to give abrasive blasting workers the warnings their own employers should have given them.

\*　　\*　　\*　　\*　　\*　　\*

For these reasons, the court of appeals' judgment is reversed and the case is remanded to the trial court for a new trial.

Justice O'NEILL filed a dissent, in which Justice SCHNEIDER joined.

Justice O'NEILL, joined by Justice SCHNEIDER, dissenting.

The Court acknowledges that (1) silica flint, when used as a blasting agent, is a dangerous and potentially fatal substance, (2) employees in the blasting industry did not know about health hazards caused by its use and the need to properly protect against them, (3) industry employers did know but "neglected safety *despite* their knowledge," 146 S.W.3d at 184, (4) the burden on Humble to provide an adequate warning on 100–pound bags of silica flint was "inconsequential or nonexistent," *id.* at 193, and (5) "Gomez would have escaped injury had Humble's bags borne an adequate warning label." *Id.* at 192. Despite these compelling and undisputed facts, the Court concludes that, as a matter of law, Humble had no duty to warn potential users of its product's dangers if it can demonstrate that, industry-wide, (1) some/most/all (it's unclear from the Court's opinion) operators used bulk-supplied rather than bagged flint, (2) any warning given would not have reached some/most/all (it's unclear) blasting workers, and/or (3) some/most/all (it's unclear) blasting workers would have disregarded the warning.

Conflating duty and causation, and combining select elements of different exceptions to a product supplier's general duty to warn, the Court concludes that this case should be retried to allow Humble to prove that it owed no duty to workers like Raymond Gomez. If I were Humble, I would surely appreciate the second chance—but I wouldn't have a clue what to do. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 776 (Tex.2003) (O'Neill, J., concurring). For example, is proof that two out of four employees working around silica flint would disregard an adequate warning sufficient to negate the general duty to warn? Does the relevant inquiry concern only abrasive blasters, or all employees who work in blasting facilities and are exposed to silica dust? If only thirty-five percent of blasting businesses provide safe working conditions, is the duty to warn discharged? If only twenty percent of the silica flint used in the industry is supplied in bags, are bag-suppliers relieved of a duty to warn? Is the "industry" to which the Court refers national, state or regional? Not to mention the inherent difficulty of obtaining and presenting the type of fact-intensive proof that the Court describes, the Court's analysis raises these and myriad other ques-

---

**69.** *Post* at 204.

tions that will likely prove to be problematic, at best, if not unanswerable.

The Court professes to find support for its approach in the Restatement (Second) of Torts, but the Restatement factors clearly compel the opposite result. The Court's improper application of the sophisticated-user doctrine in this case establishes a dangerous precedent that severely undermines worker safety. While I agree that the sophisticated-user doctrine has merit and should apply in appropriate circumstances, this is not one of them. Accordingly, I dissent.

## I

In *Alm v. Aluminum Co. of America*, we discussed several fundamental principles that guide our analysis in cases involving a manufacturer's duty to warn users of product dangers. 717 S.W.2d 588 (Tex. 1986). The Court subverts that analysis by ignoring its fundamental premise: a product manufacturer has a duty to inform users of potential hazards associated with the product. *Id.* at 591. Exceptions to this general rule do exist. We recognized in *Alm* that a manufacturer may depend on an intermediary to communicate a warning to the ultimate user in certain situations. *Id.* But the mere presence of an intermediary does not excuse the manufacturer from warning those whom it should reasonably expect to be endangered by its product's use. *Id.* "The issue in every case is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product." *Id.* (citations omitted).

In *Alm*, these principles helped frame our discussion of two specific exceptions to the general rule that a product manufacturer has a duty to warn users. *Id.* at 591–92. One, the so-called "bulk-supplier" exception, recognizes the difficulties inherent in warning ultimate consumers of possible dangers when a manufacturer supplies a product in bulk with no package of its own on which to place warnings. *Id.* at 592. We recognized that, in some circumstances, a supplier could depend on an intermediary to communicate a warning to the ultimate user. *Id.* at 591. We analogized Alcoa, the designer and manufacturer of a capping system for soft-drink bottles, to a bulk supplier because it "ha[d] no package of its own on which to place a warning and no control, except by contractual requirements, over the final package labeling which reaches consumers." *Id.* at 592. Thus, it was difficult for Alcoa to directly warn consumers of the hazard of bottle cap blow off. *Id.* We stated that Alcoa "should be able to satisfy its duty to warn consumers by proving that its intermediary was adequately trained and warned, familiar with the propensities of the product, and capable of passing on a warning." *Id.* But we also warned that if Alcoa failed to adequately warn and train the purchaser of its product, or if the purchaser was incapable of passing on the received warning, "Alcoa would not have discharged its duty to the ultimate consumer." *Id.* The adequacy of Alcoa's warning to its intermediary, we stated, was a question of fact for the jury. *Id.*

We also recognized cases that had applied the learned-intermediary doctrine. *Id.* at 591 (citing *Cooper v. Bowser*, 610 S.W.2d 825, 830–31 (Tex.Civ.App.-Tyler 1980, no writ), and *Gravis v. Parke–Davis and Co.*, 502 S.W.2d 863, 870 (Tex.Civ. App.-Corpus Christi 1973, writ ref'd n.r.e.)).Under that doctrine, "when a drug manufacturer properly warns a prescribing physician of the dangerous propensities of its product, the manufacturer is excused from warning each patient who receives the drug." *Id.* However, we warned that "even in these circumstances,

when the warning to the intermediary is inadequate or misleading, the manufacturer remains liable for injuries sustained by the ultimate user." *Id.* at 592 (citing *Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801 (Tex.1978), and *Crocker v. Winthrop Labs., Div. of Sterling Drug, Inc.,* 514 S.W.2d 429 (Tex.1974)).

In the past, then, when the Court has seen fit to recognize exceptions to the general rule that manufacturers have a duty to warn potential users of dangers involved in its product's use, those exceptions have been narrowly tailored to situations where (1) the manufacturer would have difficulty in providing a warning itself, and (2) "its intermediary was adequately trained and warned, familiar with the propensities of the product, and capable of passing on a warning." *Id.*

The sophisticated-user exception has been recognized as being similar in nature to both the bulk-supplier and learned-intermediary exceptions, with all three doctrines finding support in the Restatement (Second) of Torts. *See In re Silicone Gel Breast Implants Prods. Liab. Litig.,* 887 F.Supp. 1463, 1466–67 (N.D.Ala.1995); *Whitehead v. The Dycho Co.,* 775 S.W.2d 593, 597 (Tenn.1989); Ausness, *Learned Intermediaries and Sophisticated Users: Encouraging the Use of Intermediaries to Transmit Product Safety Information,* 46 Syracuse L.Rev. 1185, 1195, 1216–17 (1996). In applying the sophisticated-user doctrine for the first time, one would expect the Court to recognize that the exception is limited in scope, much like the bulk-supplier and learned-intermediary doctrines. As applied by the Court today, however, the sophisticated-user exception swallows the rule, absolving manufacturers of the duty to warn even when the product is admittedly dangerous and the manufacturer could easily provide an effective warning.

## II

The Court goes out of its way to excuse Humble's failure to adequately advise potential users of its product's dangers, despite the fact that Humble had no difficulty placing a warning on its bags, provided bad information to Spincote in its Technical Fact Sheet, and sold to a purchaser that the record demonstrates did not fully appreciate the dangers involved in the product's use. This reasoning is directly contrary to the principles we recognized in *Alm* and the factors described in section 388 of the Restatement, which the Court purports to follow. Correctly applying our own precedent and the Restatement factors to the circumstances presented in this case leads to only one inescapable conclusion—that Humble is not entitled to the sophisticated-user doctrine's protections. *See* Restatement (Second) of Torts § 388 cmt. n (1965).

The Restatement articulates several factors to be weighed in deciding whether a manufacturer may invoke the sophisticated-user doctrine. Those factors are designed to strike a careful balance between promoting worker safety and protecting responsible manufacturers. They include:

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the [supplier] by requiring that [it] directly warn all users.

*See, e.g., Willis v. Raymark Indus., Inc.,* 905 F.2d 793, 796–97 (4th Cir.1990); *Smith v. Walter C. Best, Inc.,* 927 F.2d 736, 739–40 (3d Cir.1990); *Eagle–Picher Indus., Inc. v. Balbos,* 326 Md. 179, 604 A.2d 445, 464 (1992). Each of these factors weighs

powerfully against applying the sophisticated-user doctrine in this case.

*A. The dangerous condition of the product/the purpose for which the product is used*

Although silica flint is not dangerous when delivered in bags, the only purpose for which the flint is used—sandblasting—renders it highly dangerous. Without specific safety controls, the risk of inhaling silica dust is extremely high. Consistent exposure to silica dust will likely lead to silicosis, a potentially fatal disease. These factors weigh against applying the sophisticated-user doctrine in this case.

*B. The form of any warnings given*

The jury found, and Humble does not contest, that the warning Humble placed on its bags during most of Gomez's sandblasting career was inadequate. Beginning in 1993, before Gomez stopped working as a sandblaster in 1994, Humble placed on its bags a much clearer warning that highlighted the dangers of inhaling silica dust. The information in the newer warning was available before Gomez ever worked at Spincote. The form of the later warning was no different than the earlier one; only its substance differed. This factor weighs against application of the sophisticated-user doctrine.

*C. The magnitude of the risk involved*

The dangers silica dust poses to workers like Raymond Gomez cannot be overstated. The silica that Humble sold was intended for sandblasting. Silica is extremely dangerous as a sandblasting agent; the dust becomes so fine that it cannot be seen with the naked eye. If reused, as Humble recommended, the product breaks down further and becomes even more dangerous. Inhalation of this fine dust can lead to silicosis, an incurable disease that permanently scars the lungs and reduces the body's ability to take in air. Once inhaled, the dust cannot be removed. Individuals with silicosis face not only limited occupational prospects, but also a significantly shortened life span. The grave health risks posed by silica dust weigh against relieving Humble of the duty to warn likely users of the dangers inherent in silica's use.

*D. The burdens imposed on the supplier by requiring that all users be directly warned*

Requiring Humble to place an adequate warning on its 100–pound bags of silica flint would not be burdensome; indeed, Humble was already placing a warning on its bags in 1983 and has continued to do so. That more information was necessary to make the warning adequate does not make it burdensome. The much more thorough warning that Humble later placed on its bags is slightly longer than the original warning and considerably more informative, requiring nothing more to produce than additional ink.

The Court acknowledges that the burden on a supplier of bagged flint to warn "is either inconsequential or nonexistent," but expresses concern that the warning might not actually reach blasting workers and might be ineffectual if it did. 146 S.W.3d at 193. But application of this factor does not turn on the burden a manufacturer would face if it were required to warn every possible party affected by the product. Comment l to section 388 of the Restatement (Second) of Torts makes clear that "[t]he supplier's duty is to exercise *reasonable* care to inform those for whose use the article is supplied of dangers which are peculiarly within his knowledge." Restatement (Second) of Torts § 388 cmt. l (1965) (emphasis added). If the burden this factor contemplates was to ensure that warnings would be read by every possible person using the product, as the Court posits, suppliers would routinely

be relieved of any duty to place warnings on packaged goods. While Humble might be able to argue under different circumstances that its warning would not likely reach most users, the facts here belie any such concern. In this case, Gomez routinely handled Humble's bags and actually read Humble's inadequate warning. And Gomez was exactly the type of worker who would be expected to handle Humble's product and see its warning. Spincote even requested that Humble include a Spanish version of the warning placed on its bags, indicating that Spincote believed the warning would reach its employees and that they would heed it. Clearly, this factor weighs against applying the sophisticated-user doctrine in this case.

*E. Reliability of the third party as a conduit of necessary information*

The Court proceeds from the premise that the sandblasting industry has known the dangers involved in silica's use since the early 1930s. While this may be generally true, much of the evidence regarding industry knowledge indicates that the extent of the danger was not widely appreciated. Ken Gray, vice president and head of safety at Spincote, regularly walked through the blast house without respiratory protection, exposing himself to fine silica dust. Gray testified that he initially believed that silica was a "nuisance dust" and was continually learning about the dangers of silica. He had not even heard the term "silicosis" until 1986, when a former employee contracted the disease. Gray also acknowledged that when he arrived at Spincote in 1981, the danger of silica was not fully understood.

Other testimony revealed significant safety problems in the decade prior to Gomez's employment at Spincote. The former president of a different sandblasting company testified that overexposure to sand was "absolutely widespread" during the 1970s due to a lack of appreciation for the dangers silica posed. Studies of the sandblasting industry commissioned by the National Institute for Occupational Safety and Health during the early 1970s showed that there was "very little knowledge, especially in the medium to smaller size companies on what kind of respiratory equipment should be used and how it should be used." Another study indicated "that the persons responsible for selecting abrasive blasting respiratory ... equipment are none too informed nor interested in the subject. Their concern is with abrasive blasting per se and not with safety measures." While these studies predate Gomez's tenure at Spincote, they demonstrate that even though the dangers of silica had been documented some forty years earlier, the sandblasting industry still did not fully appreciate the dangers that silica dust created. If "[t]he average firm safety man ... seems unaware of the problems of respirable dust," 146 S.W.3d at 175, as the Court recites, how can it be conclusively presumed that the "industry" knew?

The Court's citation to other cases involving sophisticated users of silica flint is unpersuasive. Those cases involved *bulk* silica shipments to foundry facilities. *Bergfeld v. Unimin Corp.*, 319 F.3d 350 (8th Cir.2003); *Smith*, 927 F.2d at 738; *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552 (W.D.Va.1984). In *Goodbar*, the court found that the intermediary foundry possessed extensive knowledge of the dangers of silica. *Goodbar*, 591 F.Supp. at 562. The foundry's vice president had been a member of the American Foundrymen's Society, which had discussed problems with dust collection in the foundry setting and passed along information about the dangers of silica to other members. *Id.* The court noted that, as early as the 1930s, many foundries had begun silicosis

control programs, which included medical reviews, information distribution, x-rays of high-risk employees, and monitoring of silica dust concentrations. *Id.* Finally, the court cited a health study done at the foundry that demonstrated a "full comprehension" of the dangers of silica dust. *Id.* at 563. *Bergfeld* and *Smith* involved similar facts. *Bergfeld,* 319 F.3d at 354 ("Bergfeld concedes that Deere possessed the kind of generalized industry knowledge described in *Goodbar* and *Smith.*"); *Smith,* 927 F.2d at 740 n. 3 ("*Goodbar* involved facts virtually identical to those alleged here.").Nothing in the record suggests that Spincote's knowledge, or the knowledge of the sandblasting industry generally, was even remotely like the knowledge that the intermediary foundries in the cited cases possessed. To the contrary, the record in this case suggests that the industry as a whole has been more concerned with product utility than worker safety. Even Humble's counsel acknowledged during oral argument that the industry had a powerful disincentive to adequately warn because a proper warning might lead "all abrasive blasting workers to quit their jobs."

In addition, a central focus of the sophisticated-user doctrine is the reasonableness of the supplier's reliance on its intermediary's knowledge. Humble took no steps to determine Spincote's level of knowledge concerning silica's dangers. Instead, Humble sent Spincote a Technical Fact Sheet and a Material Safety Data Sheet that contained inaccurate and misleading information about silica flint and the dangers associated with its use. The Data Sheet stated that respiratory disease could result from years of exposure to silica, when in fact silicosis can begin after a few months of exposure. The Data Sheet also recommended using air-fed hoods as a means of eye protection, even though the hoods are necessary to keep silica dust out of workers' lungs. Finally, the Fact Sheet recommended reusing silica flint without noting that reuse made the product more dangerous by creating finer silica dust particles.

The Court brushes aside concerns about Humble's misinformation, concluding that objective industry-wide knowledge of silica's dangers renders the inadequacies of Humble's warning immaterial. But under the Restatement, Humble's failure to provide accurate information to Spincote weighs against a determination that Humble was reasonable in relying on Spincote as a knowledgeable user of silica flint. *See Balbos,* 604 A.2d at 464 ("Under the Restatement view a court focuses on the conduct of the *supplier* of the dangerous product, not on the conduct of the intermediary."). The Court gives suppliers the benefit of the doubt, even though the Restatement imposes a higher degree of responsibility:

> [I]t may be improper to ... trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of whose character [the supplier] knows nothing. It may well be that [the supplier] should take the risk that this information may not be communicated, unless he exercises reasonable care to ascertain the character of the third person, or unless from previous experience with him or from the excellence of his reputation the supplier has positive reason to believe that he is careful. In addition to this, if the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful.

Restatement (Second) of Torts § 388 cmt.n (1965).

It escapes me how a supplier's reliance on an intermediary can be reasonable when, as the Court states, "the record establishes that [operators] routinely neglected safety measures and did not warn employees." 146 S.W.3d at 193. The Court's contorted reasoning goes something like this:employers should protect their employees (but clearly don't), OSHA regulations require them to (though the regulations are pervasively ignored), therefore suppliers should be able to (but actually can't) rely on employers to adequately warn of dangers inherent in the product's use. I simply cannot conclude that Humble reasonably relied on Spincote's knowledge, or on the industry's knowledge in general, to warn those endangered by its product, particularly when the information that Humble provided was inaccurate.

The Court's opinion is also troubling in other respects. For example, the Court's emphasis on the likelihood of a warning reaching end users imports causation into the duty analysis. And what role, if any, the common-knowledge doctrine plays in the proposed analysis is confusing. The Court likens employers' general knowledge of silica's risks to the common knowledge that drinking alcohol can lead to intoxication, *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 388 (Tex.1991), smoking cigarettes can cause lung cancer, *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 428 (Tex.1997), and standing on an open scaffolding can result in a fall, *Sauder Custom Fabrication, Inc. v. Boyd*, 967 S.W.2d 349, 351 (Tex.1998), each widely known or obvious dangers that have excused product suppliers from warning in other contexts. But the record demonstrates that common knowledge of the potentially fatal effects of breathing silica dust is far different. If the industry's knowledge of silica's dangers was actually as specific and well-developed as the Court

recites, then employers like Spincote should be truly alarmed. They will likely face gross-negligence liability for failing to adequately protect their workers and lose the protection from punitive damages that the Workers Compensation Act affords. *See* Tex. Lab.Code § 408.001(b). I do not believe that the magnitude of the risk that silica dust poses is " 'so patently obvious and so well known to the community generally, that there can be no question or dispute concerning [its] existence.' " *Grinnell*, 951 S.W.2d at 427 (quoting *Brune v. Brown Forman Corp.*, 758 S.W.2d 827, 830–31 (Tex.App.-Corpus Christi 1988, writ denied)).

My sense is that the Court's abandonment of fundamental products-liability principles is an attempt to judicially cabin widespread and oft-abused mass-tort claims that have arisen from latent workplace injuries caused by substances like silica and asbestos. The systemic impact of cases involving exposure to asbestos, for example, has created what has been termed "an asbestos-litigation crisis":

> [This] is a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s. On the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related diseases, a continuing stream of claims can be expected. The final toll of asbestos related injuries is unknown. Predictions have been made of 200,000 asbestos disease deaths before the year 2000 and as many as 265,000 by the year 2015.

> The most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues

are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (alteration in original) (quoting Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation 2–3 (Mar.1991)); *see also Ortiz v. Fibreboard*, 527 U.S. 815, 822, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); House Research Org., Asbestos Litigation: An Inactive Docket Proposal (Apr. 2, 2004), *available at* http://www.capitol.state.tx.us/hrofr/focus/asbestos78–16.pdf (accessed on Sept. 16, 2004). But as the United States Supreme Court has recognized, the solution to these problems is legislative, not judicial. *See Amchem*, 521 U.S. at 598, 117 S.Ct. 2231. If the Court were to confine itself to its proper role, it would avoid the distortion of jurisprudence that will flow from today's decision.

### III

Breathtaking in scope, the Court's decision today ventures where no court has gone before, adopting confusing and legally immaterial evidentiary proof requirements to re-examine whether a duty that we have long recognized exists in the first instance. Because the Court has misinterpreted and misapplied the sophisticated-user doctrine in this case, I respectfully dissent.